[No. 19699. Department Two. April 15, 1926.]

*In the Matter of the Estate of* JOHN SEATTLE, *Deceased.*[1]

[1] WILLS (7)—TESTAMENTARY CAPACITY—EVIDENCE — SUFFICIENCY. Findings of the mental capacity of a testator, over eighty years of age, to make a will are sustained by almost overwhelming testimony that he, at the time, was fully capable of making his will and fully understood the manner in which he desired his property to be left.

[2] SAME (20)—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE. Undue influence in the making of a will is not established by mere inferences from the fact that a favored niece, with whom the testator was living, caused the will to be prepared, and had the opportunity to influence its execution, and suggested the executor named.

Appeal from a judgment of the superior court for Snohomish county, Alston, J., entered October 2, 1925, upon findings in favor of the defendants, in a will contest, tried to the court. Affirmed.

*Stuart H. Elliott, H. G. Rowland, Dix H. Rowland,* and *Knickerbocker & Hunt,* for appellants.

*Edward Mills* and *M. H. Forde,* for respondents.

PARKER, J.—This is a will contest wherein Joe Bill, a named devisee, and Aaron Neeley, the named executor in a will made and executed on May 8, 1923, by John Seattle, deceased, seek a judgment setting aside a later will, made and executed by him on September

[1]Reported in 244 Pac. 964.

24, 1923, in which Mary Henry is named as a more favored devisee and Edward Mills is named as executor. A trial upon the merits in the superior court for Snohomish county resulted in a judgment denying to Joe Bill and Aaron Neeley the relief prayed for, from which they have appealed to this court. The alleged grounds of contest are want of mental capacity on the part of Seattle to make a will at the time of making this last will, and also undue influence by Mary Henry in inducing him to make that will.

John Seattle was a full blood Indian. He had severed his tribal relations forty years or more before he died. During that period, he lived, first, near Puyallup in Pierce county, then for some twenty years near Auburn in King county, and then for some four months at the home of Mary Henry at Tulalip in Snohomish county, where he died on January 19, 1924. He was frugal in the acquisition and care of his property, and possessed at the time of his death an estate consisting of land, personal property and money, of the value of several thousand dollars. He could not read or write the English language, but that did not seem to materially impair his ability to care for and protect his property interests. He could make himself understood to, and could understand, one who was capable of using only the English language, though his use of that language and his understanding of it were somewhat limited.

On May 8, 1923, he duly made and executed a will, by the terms of which he devised all of his property, subject to his debts and funeral expenses, in equal shares to Joe Bill, his nephew, and Mary Henry, his grand niece; they being his only living relatives of that or any nearer kin. We shall hereafter refer to them by their first names. It is conceded that he was

then mentally capable of making a will. Seattle was then living alone upon his own farm near Auburn. Joe Bill lived a mile or so distant, and Mary lived with her husband at Tulalip in Snohomish county, some seventy miles distant. Seattle then being an old man, Joe was supposed to be looking after him as a relative would ordinarily be expected to do, and frequently visited him, though he needed no help financially. Mary did not visit him so frequently, because of being farther away, but did occasionally visit him during many years preceding his death, having done so on two or three occasions during the spring and summer of 1923; these visits seeming to be for the most part each of two or three days' duration. Notwithstanding Joe was living nearer to him and more frequently visited him, there seemed to be closer bonds of affection between him and Mary.

About August, 1923, he had become dissatisfied with his lonely life, apparently feeling that Joe did not pay enough attention to him. With a view of bettering his condition, he induced Mary to take him to her home at Tulalip to live with her and her husband. This she did on September 12, 1923. He then expressed a desire to take his money with him and have it deposited in a bank at Everett, that being but a short distance from Tulalip. His money was then on deposit in a bank at Auburn. Mary went with him to the Auburn bank from which he drew out several hundred dollars, which he took to Everett and deposited in a bank there. Later he caused the balance of his money, a considerably larger sum, to be drawn out of the Auburn bank and transferred to his account in the Everett bank. His bank account at Everett was so arranged that Mary could check against it and use the money as his needs might require. It was apparently then under-

stood between him and Mary that she was going to care for him at her home the rest of his life.

After arriving at Tulalip and being settled in Mary's home, he expressed a desire to make a new will and leave a larger share of his property to Mary. There is no direct evidence that she encouraged or induced him to do this. She testifies directly to the contrary. However, he told her how he desired his new will to be made, and at his request she had such a will prepared by Mr. Forde, an attorney of Everett; she giving Mr. Forde the data therefor as instructed by Seattle, so she testifies, and there is no evidence to the contrary. A day or two thereafter, on September 12, 1923, Mr. Forde, having prepared the will in typewriting as instructed, took the will to Mary's home at Tulalip, a few miles distant from Everett, where it was read over and its terms fully explained to Seattle by Mr. Forde, partly through an interpreter so far as was necessary, so that Seattle seems to have fully understood its terms and approved it in all particulars as drawn up by Mr. Forde. It was then signed by Seattle by his mark and witnessed in due form by Mr. Forde and Mrs. Mitchell there present. There were also there present at that time four other persons, including Mary and her husband. Neither Mary nor her husband said anything with reference to the will at that time. By the terms of that will Mary was made a more favored devisee and Joe was made a less favored devisee than by the terms of the former will, Seattle devising his property to Mary and Joe in this last will as follows:

"I give, devise and bequeath to Joseph Bill and Mary E. Henry, wife of Thomas Henry, the following described real property, situated in King County, State of Washington, towit: [Here is described Seattle's farm near Auburn.] Said land to be equally divided

as to the amount of acreage, but it is my will that the said Mary E. Henry shall have the half of said land upon which are located the orchard and the buildings.

"I give, devise and bequeath to the said Mary E. Henry, who is my relative and benefactress, all the rest and residue of my estate, real, personal or mixed, and wheresoever situated, which I may own, or in which I may be interested at the time of my decease."

By the terms of that will, Edward Mills, an attorney of Everett and a former agent of the Tulalip Indian Reservation near there, was named as executor with enumerated powers substantially as were conferred upon the executor Neeley by the terms of the first will. Edward Mills and Seattle were strangers to each other, and it may be assumed that Edward Mills was named executor in this last will at the suggestion of Mary, though the evidence seems plain that Seattle freely assented thereto. Seattle continued to live at the home of Mary, being apparently well cared for, until January 19, 1924, when he died there, being then about 85 years old. Thereafter on January 29, 1924, by the usual statutory *ex parte* proceeding, this last will of Seattle was duly proven and admitted to probate in the superior court for Snohomish county, and the executor, Edward Mills, thereupon duly qualified and entered upon his duties in the administration of the estate. Thereafter in due time this contest of this last will was commenced and prosecuted with the result we have already noticed. The facts so far related by us, we think, may be regarded as undisputed or conclusively proven.

[1] There was a great deal of testimony given upon the trial touching the question of Seattle's mental condition at the time of and for a considerable period immediately preceding his removal to Mary's home at Tulalip. Looking to this testimony alone, there is

room for arguing that it preponderates to the effect that Seattle was not at that time mentally capable of making a will. That evidence, to our minds, however, is not without serious conflict, even as to the condition of Seattle's mind being such as to render him incapable of making a will at that time. He seems to have been fully conscious of a fixed desire to go to Mary's home to live and of the desirability of removing his money from the Auburn bank to an Everett bank, to the end that it would be readily accessible to supply his needs at his new home. He was then physically weak, evidently largely because of lack of proper nourishment; and was also then failing in memory, particularly in readily recognizing his acquaintances.

Passing now to a consideration of the testimony of numerous witnesses touching the condition of Seattle's mind after removing to Tulalip, and especially at the time he executed this last will on September 24, 1923, we deem it sufficient to say that the testimony bearing upon his then condition seems to be almost overwhelming, in support of his being then fully capable of making this last will and of then fully understanding and appreciating the manner in which he then desired his property to be left.

It is true that the witnesses testifying as to his condition—other than the testimony of Mary, which we ignore for present purposes—was based upon observation of him only after he had come to Tulalip and for the most part very near and at the time of his execution of this last will. To analyze here in this opinion all of the testimony given touching the mental condition of Seattle at the time of his making of this last will, and for a considerable time immediately preceding, would be a long story and would, we think, serve no useful purpose at this time. A somewhat

painstaking review of the voluminous testimony leads us to the conclusion that the learned trial judge correctly held that Seattle was not at the time of making this last will mentally incapacitated from effectively doing so. The will is not at all unnatural in its provisions, in view of the relationship existing between Seattle and Mary and Joe.

[2] Turning now to the question of undue influence on the part of Mary inducing Seattle to make her a preferred devisee, we have nothing to support such contention other than such inference as might be drawn from the fact that Mary caused the will to be prepared; the appointment of Edward Mills as executor at her suggestion; and the opportunity she had to influence Seattle after taking him to her home at Tulalip. We have already noticed that there is absolutely no direct evidence whatever that Mary solicited or advised in any manner Seattle to make a will so as to make her a more favored devisee than she had been made by the terms of the first will; that, while she suggested the appointment of Edward Mills as executor, that appointment was freely concurred in by Seattle, and that, while she had opportunity to influence him, the only testimony on that question is that she did not attempt to influence him. These facts, we think, clearly are not sufficient to sustain a conclusion that the making of the will was the result of undue influence or coercion on the part of Mary.

In so far as we are concerned with the question of Seattle's mental capacity to make this last will, the application here of the general rule quoted with approval by Judge Reavis, speaking for the court in *In re Gorkow's Estate*, 20 Wash. 563, 56 Pac. 385, seems to us controlling in support of the conclusion we here reach. That rule, quoted from 1 Redfield, Wills, 124, is as follows:

" 'The result of the best considered cases upon the subject seems to put a quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should at the time of executing the will know and understand what he was about.' "

This view of the law, stated in substance but in somewhat varying terms, has been repeated and adhered to by this court in numerous later decisions, among which may be noted the following: *Jasinto v. Hamblen,* 79 Wash. 590, 140 Pac. 677; *Points v. Nier,* 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A 1046; *In re Geissler's Estate,* 104 Wash. 452, 177 Pac. 330.

In so far as we are concerned with the question of the alleged undue influence on the part of Mary inducing Seattle to make this last will, naming her as a more favored devisee, we think the law, as announced by this court in repeated decisions, lends support to the trial court's judgment and the conclusion we here reach. In *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515, Judge Crow, speaking for the court, said:

"To vitiate the will an influence must be shown which, at the time of the testamentary act, controlled the volition of the testator, deprived him of free will agency, and prevented an exercise of his judgment and choice."

In *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682, Judge Main, speaking for the court, said :

"Wills are favored in the law, and it is a cardinal principle of construction that the testimony to overcome them must be cogent and convincing. *In re Geissler's Estate,* 104 Wash. 452, 177 Pac. 330. Where the will, rational on the face of it, is shown to have been executed in legal form, the law presumes testamentary capacity. *In re Hanson's Estate,* 87 Wash. 113, 151 Pac. '264. . . . To vitiate a will on the

ground of undue influence, the evidence must show that the testator's volition at the time of the testamentary act was controlled by another, and that the will was not the result of a free exercise of judgment and choice. *Converse v. Mix,* 63 Wash. 318, 115 Pac. 305; *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515.''

In *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47, Judge Main, again speaking for the court, made this pertinent observation:

''To vitiate a will there must be more than influence. It must be undue influence. It was not undue influence for the son to persuade or solicit his mother to award him the greater part of the estate rather than to award it to the daughter. Influence becomes undue only when it overcomes the will of the testator or the testatrix, when the act of making the will is the result of such coercion that free agency is destroyed. The disposition of the property may be changed by the influence exercised, but so long as the mind of the testator or testatrix is not overborne by the mind of another, it does not amount to undue influence.''

In *In re Adin's Estate,* 112 Wash. 379, 192 Pac. 887, we held that the drafting of a will by a beneficiary thereunder, it being shown to have been drafted as desired by the testator, did not render the will void by reason of undue influence. See, also, *Converse v. Mix,* 63 Wash. 318, 115 Pac. 305; and *In re Zelinsky's Estate,* 130 Wash. 165, 227 Pac. 507.

We conclude that the record in this case fully justified the trial court in holding that, at the time of the making of this last will, Seattle was possessed of mental capacity to make a will and that he made that will exactly as he desired to have it made, without being unduly influenced so to do by Mary or anyone else.

The judgment is affirmed.

TOLMAN, C. J., MAIN, MITCHELL, and MACKINTOSH, JJ., concur.