[No. 24175. Department Two. January 5, 1933.]

EDITH EBLE et al., *Respondents,* v. OTTO BLOCH, *Appellant.*[1]

*Grady & Velikanje* and *Stanley P. Velikanje,* for appellant.

*Rigg, Brown & Halverson,* for respondents.

BEALS, J.—Alex Will, a bachelor past seventy-three years of age, died in Yakima county, Washington, February 14, 1932. The next day, Otto Bloch, a friend, though no kin, of deceased, petitioned the superior court for the probate of a paper writing of testamentary nature, bearing date January 18, 1932, as the last will and testament of the deceased. The court granted the petition and admitted the document to probate, confirming Mr. Bloch's appointment as executor thereof.

Edith Eble and others, nieces and nephews of the deceased, seasonably filed in the probate proceeding their contest of the will, alleging that, at the time of the execution thereof, Mr. Will lacked testamentary

[1]Reported in 17 P. (2d) 867.

capacity, and that the document was procured by undue influence and fraud on the part of Otto Bloch. Mr. Will left property of considerable value, and by the document admitted to probate as his will, he bequeathed all his property and estate to Mr. Bloch. Issues were made up upon the will contest filed by Mr. Will's kinfolk, and a trial to the court, sitting without a jury, resulted in a decree revoking the probate of the purported will, from which decree Otto Bloch appeals.

It appears from the evidence that Mr. Will had, for several years prior to his death, been engaged in construction work, a good deal of the time in the employ of appellant, who was a contractor. Deceased and appellant were very friendly, and in 1928, deceased lent appellant three hundred dollars, for which he took appellant's note. Mr. Will was born in Scotland, one of a family of four boys and three girls. Some of his brothers and sisters remained in Scotland, while others came to America, some settling in Canada, others in the United States. One sister now resides in Australia. Mr. Will maintained some correspondence with his relatives; he kept some of their letters and noted their names and addresses for future reference. He occasionally talked to certain of his friends in Yakima concerning his relatives, and about four years prior to his death, he requested one of his friends to notify Mrs. Eble in case of his death.

Appellant introduced testimony to the effect that, sometime during the winter of 1928, while Mr. Will was in appellant's employ, they knocked off work one afternoon because of the inclemency of the weather, and went to the room of one of their friends for rest and warmth. On this occasion, Mr. Will indicated by his conversation that he did not expect to live very long, and that he wanted appellant to take care of him and see that he had a decent burial. Appellant then

stated that if he survived Mr. Will, he (appellant) would look after him. Appellant's testimony also indicates that appellant then asked Mr. Will whom he should notify in case of Mr. Will's death, to which Mr. Will answered that there was no one to notify. Appellant then asked Mr. Will what he was going to do with his property, to which Mr. Will answered, "You might as well have it as anybody; I have nobody to leave it to," and the two men then shook hands, as in witness of a bargain.

Appellant also testified that, on the day following his wife's funeral, he and Mr. Will talked over various phases of life and death, and that Mr. Will remarked that appellant had given his wife a good funeral, and then said, "I hope you haven't forgotten your promise to me," to which appellant replied, "I sure haven't, if I don't go first."

On the morning of January 18, 1932, Mr. Will entered the lodging house where he had formerly resided, and which he had left for the purpose of procuring a warmer room. Friends whom he met immediately observed that he was very ill. Although the weather was cold, he was wearing no overcoat, and had not laced his shoes. It was noticed that he went through the motions of filling his pipe, although the pipe, in fact, had fallen to the floor. Appellant was notified that Mr. Will was ill, and he took him to the hospital, where he was put to bed.

Mr. Will at this time gave to the hospital authorities as the name of his nearest relative that of his brother, James Will, who, he stated, was residing in Wisconsin, when, in fact, James was living in Scotland. It appears that his statements concerning his relatives were somewhat confused, but there is no question but what he stated that he had kinfolk. Upon the hospital au-

thorities asking who would be responsible for the expenses, appellant stated that he would be responsible.

Medical examination of Mr. Will disclosed that he was suffering from a toxic poison which had gone through his entire system. The exact cause of his illness and subsequent death was not determined until a *post mortem*, which disclosed the true situation, kidney and bladder trouble. The doctors testified that their first examinations of Mr. Will disclosed that he was suffering from shock caused, possibly, by cold, and that he was mentally confused. Their testimony indicated that a person suffering from toxic poisoning would have both rational and irrational spells.

After taking Mr. Will to the hospital, appellant promptly consulted his attorney, and told him that he had guaranteed Mr. Will's hospital bill, and that he had a previous agreement with Mr. Will whereby he (Bloch) was to receive what money Mr. Will should leave. Appellant testified that, at this time, he did not suppose that Mr. Will owned any property beyond probably seven or eight hundred dollars and the three hundred dollar note which appellant owed him. The attorney naturally stated that, under these circumstances, the best thing to do was for the sick man to make his will.

At one o'clock appellant found Mr. Will awake, and they conversed for about half an hour. In the course of their conversation, appellant told Mr. Will that he had consulted his attorney, who had stated that a will should be drawn, and asked him if he wanted to make his will, to which Mr. Will answered that this might as well be done. Appellant then returned to his attorney's office, where a will was prepared.

Between three and four o'clock in the afternoon, this document was presented to Mr. Will by appellant, and Mr. Will was reading the paper when a mem-

ber of the law firm which had been consulted by appellant entered the room. Mr. Will finished reading the document and commented to the attorney upon a provision therein to the effect that, if any person should claim the estate on the ground that he was a child of Mr. Will, and such claim should be established, such person should receive the sum of one dollar. Mr. Will then signed the document, which was witnessed by the attorney and one of the nurses.

The validity of the vague and nebulous agreement between deceased and appellant, concerning which appellant testified, whereby appellant was to look after Mr. Will and arrange for his funeral, is not before us for determination. Of course, Mr. Will knew his own financial condition, and that he was possessed of ample means with which to provide for himself and his burial. It is not reasonable to suppose that, by what he said to appellant, he intended that appellant should assume any financial obligation whatever. Neither is appellant's guaranty to the hospital of any particular significance. Appellant owed Mr. Will three hundred dollars, and, if it had appeared that the expense was amounting to more than Mr. Will's property could satisfy, the guaranty could have been, upon reasonable notice, terminated.

The suggestion that deceased make a will came from appellant. The will was drawn by appellant's attorney, and bequeaths everything to appellant, naming him executor without bond. Paragraphs 6 and 7 of the alleged will read as follows:

"(6)   In case I survive my said friend, Otto Bloch, then in that case I give, devise and bequeath the rest and residue of my estate to his children, share and share alike.

"(7)   In case I survive my said friend, Otto Bloch, then in that case I nominate and appoint Helen Bloch, the daughter of my friend, Otto Bloch, the executrix

of this my Last Will and Testament under the same conditions and with like powers hereinbefore enumerated in paragraph five."

It does not appear that Mr. Will was particularly acquainted with Miss Helen Bloch or any of Mr. Bloch's family, other than himself, and no possible reason is suggested why, in case of appellant's death prior to that of Mr. Will, appellant's children should receive all of Mr. Will's estate, or why, in that event, Miss Bloch should act as his executrix.

One of the doctors who examined Mr. Will on the day. the document in question was executed, while testifying generally for appellant, after giving his answers to certain hypothetical questions propounded to him by appellant's counsel, stated, in answer to the question by respondent's counsel as to whether or not Mr. Will was competent to transact business at one o'clock in the afternoon on January 18, "I don't know," and, in answer to a later question as to whether or not he would say that Mr. Will was then competent to transact business, stated "No, I wouldn't say he was," indicating that, on the direct issue as to Mr. Will's testamentary capacity, he expressed no opinion.

The will was very promptly offered for probate, and appellant immediately took possession of the property, papers and effects of his deceased friend. When the will was offered for probate, appellant testified that Mr. Will left no relatives.

The possession of testamentary capacity includes an understanding and reasonably full comprehension of the act which is being performed, the nature and extent of the property which will pass by the will, and the recollection of the objects of the testator's bounty. *In re Rutherford's Estate,* 110 Wash. 148, 188 Pac. 27; *In re Roy's Estate,* 113 Wash. 277, 193 Pac.

682; *In re Vaughn's Estate*, 137 Wash. 512, 242 Pac. 1094; *In re Seattle's Estate*, 138 Wash. 656, 244 Pac. 964. It is clear that Mr. Will, at the time he signed the document in question, did not have his relatives in mind. His thoughts were manifestly in a state of utter confusion.

The trial court ably summed up the matter, and its resume of the case is part of the statement of facts. The court was evidently not favorably impressed by appellant's story; his lack of candor appears all through his testimony. He by turns denied and admitted that he had discussed with his attorney the matter of the preparation of a testament for Mr. Will at the time of his first consultation with his lawyer, before Mr. Will had said anything about the matter. The following is a sample of his testimony concerning the preparation of the will:

"Q. When did you again go to the hospital? A. One o'clock or a little after, when I came back from lunch. Q. Did you see Mr. Will then? A. I did. Q. How long were you with him? A. Perhaps half an hour. Q. About half an hour, that would make it about two o'clock, you think? A. No. Q. What time would you make it when you left the hospital? A. Well, about one, one-thirty. Q. Where did you go then? A. Then I came down to Mr. Velikanje's office. Q. You came to Mr. Velikanje's office directly from the hospital? A. Yes. Q. Was the will then drawn by Mr. Velikanje? A. It was. Q. You told him what to put in it? A. I didn't tell him nothing. Q. You didn't tell him anything? A. No. Q. How did he know what to put in? A. He just drawed up a will. Q. How did he know how to draw the will if you didn't tell him anything? A. How did he know what to put into it? Q. Yes. A. I don't know, he drew the will. Q. You didn't tell him what to put in it at all? A. No. Q. Never told him a word? A. No. Q. Had he seen Mr. Will that day? A. No, I don't suppose he had. Q. You know he hadn't, don't you? A. (No answer) Q. And you

230

didn't tell him anything to put in? A. I told him what our agreement was. Q. I am not asking about any agreement, what did you tell Mr. Velikanje to put in that will? A. Well, he just drawed up a will. Q. The fact is this, you told Mr. Velikanje to draw a will leaving everything to you, didn't you, answer yes or no? A. Well, I was supposed to be the —— Q. Answer that question yes or no? A. I suppose that is —— Q. You can answer that yes or no, did you or did you not tell him that? A. Yes. Q. You told him to appoint you as executor in that will, did you not? A. Yes. Q. And you told him also that in the event you died before Mr. Will to leave all the property to your daughter, did you not? A. Yes. Q. And you told him to provide that you should be executor without bond? A. Well, that came up, I suppose it will have to be yes when it is there."

Appellant insisted that he did not know the names or addresses of Mr. Will's relatives, although it is very clear that he must have known something about them, one witness testifying, as noted by the trial court, that he (the witness) told appellant on the day of the funeral that Mr. Will had living relatives, and that the witness at that time gave appellant Mrs. Eble's address. Appellant's counsel later communicated with the deceased's relations, but it is clear that this action was not prompted by appellant.

Appellant's testimony concerning the preparation of the will contains many contradictions, and is unsatisfactory in the extreme. He admits that the deceased gave him no specific instructions as to what provisions the will should contain, testifying that when he saw Mr. Will at one o'clock on the day Mr. Will was taken to the hospital, he told him that he (appellant) had guaranteed the hospital bill and

" ' . . . you might get over it and might not, you can't tell anything about it; the best way out is to have a will.' He says, 'You might as well have one

fixed up.' So I came down and told Mr. Velikanje about it and he drew up a will. That is all I know about it."

The testimony of the doctors and nurses as to Mr. Will's mental condition is, to some extent, in dispute, but we are of the opinion that the testamentary incapacity of the deceased on the day the will was executed was established by the preponderance of the testimony, and that any burden of proof resting upon contestants was met by the evidence which was introduced.

We are also clearly of the opinion that the document which Mr. Will signed was not, in fact, his will, but that the same embraced the ideas of appellant, rather than those of the purported testator. Appellant admits that the suggestion that a will be made came from him. We are satisfied that the execution of the document by Mr. Will was procured by the undue influence of appellant, and that the trial court did not err in vacating the order admitting the will to probate and declaring the purported will void.

It is only fair to say that no criticism whatever attaches to the attorneys who were consulted by appellant and who prepared the will; it is evident that they relied upon appellant's statements to the effect that the document was being prepared at Mr. Will's request.

The decree appealed from is in all things affirmed.

TOLMAN, C. J., STEINERT, and MAIN, JJ., concur.