[No. 28158. Department Two. May 9, 1941.]

*In the Matter of the Estate of* ADDIE SINCLAIR, *Deceased.*[1]

'Reported in 113 P. (2d) 65.

*Chavelle & Chavelle,* for appellant.

*Montgomery & Montgomery* and *Arthur E. Griffin,* for respondent.

BEALS, J.—Addie Sinclair, who for many years had been a resident of King county, Washington, died September 26, 1938. October 6th following, a will which Mrs. Sinclair had executed August 2, 1935, was admitted to probate by the superior court, and the appointment of Mary Jane Cover as executrix, she being the principal beneficiary under the will, was confirmed by the court, and letters testamentary issued. Within the time limited by law, Gertrude Osborn, who when a child had been legally adopted by Mrs. Sinclair and her husband, contested the will, alleging that, at the date of the will, the testatrix lacked testamentary capacity, and that the will was procured by fraud and undue influence exerted by Mrs. Cover, whereby Mrs. Sinclair had been induced to make the will in Mrs. Cover's favor. Mrs. Cover having by answer denied the allegations of want of testamentary capacity and of fraud and undue influence, the matter was tried to the court, with the result that an order was entered dismissing the contest. From that order, Gertrude Osborn has appealed.

Error is assigned upon the refusal of the trial court to find that Addie Sinclair was mentally incompetent at the time of the execution of the will above referred to, and upon the refusal of the court to find that that will was executed pursuant to fraud and undue influence practiced by Mary Jane Cover.

William E. and Addie Sinclair, husband and wife, then residing in the city of Syracuse, New York, during the year 1894 legally adopted Grace Breed, then a child between six and seven years of age. No children had been born to the Sinclairs, and Gertrude, as the

Sinclairs called their adopted daughter, remained with them until she was nearly eighteen years of age, when the Sinclairs, desiring to remove from New York state to Colorado, left their daughter in New York, she being then engaged to be married, her marriage to Claude Osborn following shortly after the departure of her parents. After some travel, Mr. and Mrs. Sinclair took up their residence in Seattle, where Mrs. Osborn frequently visited them.

Mrs. Sinclair reached the age of eighty-three years during the year 1931, and was ill and in need of care. She suggested that her daughter, with whom her relations had always been most friendly, return to Seattle, where the daughter had resided for eight years prior to 1924, to care for her. Mr. Osborn then gave up his position in San Diego, and the family removed to Seattle, where, while paying their own expenses, they occupied a portion of the premises where Mr. and Mrs. Sinclair were living. Sometime thereafter, Mr. and Mrs. Sinclair separated, he paying her a certain amount each month. The Osborns continued to reside with Mrs. Sinclair until March, 1936, and during this period Mrs. Osborn performed many household duties and took good care of her mother, whose condition grew slowly, though progressively, worse, and who required much attention.

In 1933, a daughter of the Osborns, to whom Mrs. Sinclair was much attached, died, and early in January, 1934, Mrs. Sinclair, while visiting a department store, suffered a fall, which rendered her unconscious, and from which she recovered slowly.

As the months passed, Mrs. Sinclair for some reason turned against her daughter and son-in-law. She accused Mr. Osborn of taking some tools and some small amount of bacon. It also appears that she said that her daughter had tried to induce her to dispose

of her home for the consideration of one dollar. Appellant testified that Mrs. Sinclair had spoken to her about the matter, but denied that appellant had ever suggested such a thing.

For several years, Mrs. Sinclair, when in need of legal advice, had consulted Frank P. Rutherford, as her attorney, and it appears that Mr. Rutherford, at Mrs. Sinclair's request, under date March 16, 1936, wrote on his stationery and signed the following letter:

"Mrs. Addie Sinclair has called on me this morning and has stated that she wants you to move the balance of your things from her residence within the next three days for she has made arrangements to have another party move into her house, within the above time. Will you kindly comply with her request and oblige."

This letter was handed to the Osborns by Mrs. Sinclair herself, and they promptly complied with Mrs. Sinclair's request and departed from her home. Mrs. Osborn testified that, upon this occasion, she said: "Mother, I suppose you have changed your will," Mrs. Sinclair replying that she had not, and that she had left everything to Mrs. Osborn, at the same time bidding the Osborns an affectionate good-bye.

It appears that Mrs. Sinclair had executed wills as follows: Mr. Rutherford testified that, September 29, 1921, Mrs. Sinclair executed a will which he had prepared for her, by the terms of which Mrs. Sinclair left most of her property to her husband. Mr. Rutherford drew a second will for Mrs. Sinclair, which was executed March 30, 1933. At this time, divorce proceedings were pending between Mrs. Sinclair and her husband, and she accordingly left him nothing, but bequeathed Mrs. Osborn one thousand dollars, leaving the balance of her estate to her sister, Mary Williams, who resided in Syracuse, New York. Mr. Rutherford prepared a third will for Mrs. Sinclair, which she signed August 10, 1933, Mrs. Sinclair by that will leav-

ing only one hundred dollars to Mrs. Osborn, and the balance of her estate to her sister. In instructing Mr. Rutherford to prepare this will, Mrs. Sinclair indicated dissatisfaction with her daughter, saying that the latter had suggested that Mrs. Sinclair deed her property to her daughter. She also complained of Mr. Osborn, apparently blaming him to some extent for the trouble between Mrs. Sinclair and her husband.

Edward H. Chavelle testified that, at Mrs. Sinclair's request, he prepared for her a will which she executed January 6, 1934. By this will, Mrs. Sinclair left two hundred dollars to her sister, Mary Williams, and the entire remainder of her estate to her daughter, Gertrude Osborn.

Late in July, 1935, Mrs. Sinclair went alone to the office of W. W. Montgomery, and requested him to prepare a will for her in accordance with her instructions, which Mr. Montgomery did, the will having been executed August 2, 1935. By this will, Mrs. Sinclair revoked all former wills by her made, bequeathed four hundred dollars to her sister, Mary Williams, one hundred dollars to Gertrude Osborn, and named Mary Jane Cover as her residuary legatee, appointing Mrs. Cover her executrix without bond. This will was executed several months prior to the request of Mrs. Sinclair that the Osborns leave her home, and was, of course, in effect at the time Mrs. Osborn testified that her mother told her she had made no change in her will, Mrs. Osborn apparently being aware of the fact that in January, 1934, Mrs. Sinclair had made a will in Mrs. Osborn's favor. The will of August 2, 1935, is the will which was admitted to probate, and is here under attack.

Appellant earnestly contends that, at the date of the execution of the will of August 2, 1935, Addie Sinclair was not possessed of testamentary capacity, and

that, in any event, that will was the product of fraud and undue influence exerted by Mary Jane Cover, the principal beneficiary.

As to Mrs. Sinclair's testamentary capacity, the evidence is in some conflict, although it strongly preponderates in favor of the ruling of the trial court to the effect that Mrs. Sinclair was in possession of her normal faculties at the time of making the will in question. Mr. Chavelle testified that, when he prepared for her the will which she executed January 6, 1934, she was, in his opinion, competent to make a will, and the evidence does not indicate any great change in her condition, either mentally or physically, between that date and August 2, 1935. Testimony introduced on behalf of appellant tends to show that Mrs. Sinclair, while formerly very neat and tidy in her habits, had become less particular in the care of her person, and had fallen into personal habits which were extremely objectionable. Other evidence introduced by appellant is to the effect that Mrs. Sinclair would often talk and laugh to herself. Appellant also argues that the dissatisfaction which Mrs. Sinclair manifested in connection with the conduct of appellant and her husband shows some mental deterioration, and that her indifference to some of her former friends and some failure of memory indicate the same thing.

Appellant refers to several of our decisions, in which the elements which made up testamentary capacity have been stated, and the presence or lack of testamentary capacity discussed. This question was considered in the cases of *In re Gorkow's Estate*, 20 Wash. 563, 56 Pac. 385; *Hartley v. Lord*, 38 Wash. 221, 80 Pac. 433; and *Eble v. Bloch*, 171 Wash. 223, 17 P. (2d) 867, several other of our decisions being cited in the last mentioned case.

Measured by the recognized standards, the record

shows beyond question that, at the time of making the will of August 2nd, Addie Sinclair enjoyed a full measure of testamentary capacity.

In connection with the question of fraud and undue influence, appellant cites the recent cases of *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331, and *Foster v. Brady,* 198 Wash. 13, 86 P. (2d) 760, in which cases many of our prior decisions are discussed.

It appears that Mr. Montgomery, who prepared the will of August 2nd, was acquainted with Mrs. Dazey, the mother of Mrs. Cover, and had prepared wills for those ladies. Mrs. Sinclair, however, went alone to Mr. Montgomery's office, and on her first visit told him how to prepare the will, and upon the occasion of her second visit executed the same, with due legal formality.

Appellant contends, in the first place, that the evidence shows the existence of a confidential and fiduciary relationship between Mrs. Sinclair and Mrs. Cover. In this connection the evidence shows that Mrs. Cover attended to some personal and business matters for Mrs. Sinclair, from a date prior to the execution of the will of August 2nd; that thereafter she collected the rents from Mrs. Sinclair's property, and attended to the payment of taxes thereon. She also paid for supplies and food for Mrs. Sinclair, collected sums which Mr. Sinclair was paying monthly, and arranged for the care of Mrs. Sinclair in a sanitarium when that became necessary. It is, of course, clear that Mrs. Sinclair and Mrs. Cover were great friends. It does not appear, however, that Mrs. Cover ever exercised, or was in a position to exercise, any extraordinary or undue control over Mrs. Sinclair's mind or body.

In the case of *Foster v. Brady, supra,* the beneficiary of the will which this court set aside was not intimately

acquainted with the testator, and was acting as his physician while the testator was in an emergency hospital conducted by the doctor. The testator was eighty-three years of age, and very sick, dying two or three days after the will was executed. Such a situation suggests an influence or control far beyond anything which the record shows existed in the case at bar.

Appellant relies upon the decision of this court *In re Lee's Estate,* 145 Wash. 408, 260 Pac. 662, in which this court reversed an order of the superior court dismissing a will contest. It appeared that the testatrix, who had for a long time been suffering from cancer, three weeks before her death executed a will by which she disinherited a sister she had been assisting financially for years, and who was dependent, in favor of strangers, one of whom had evidently prepared the will. The sister was not mentioned in the will, and it did not appear that any estrangement had ever arisen between her and the testatrix. The facts in the case cited are so utterly different from those here presented that the case is not in point.

Mrs. Cover and her mother had become acquainted with Mrs. Sinclair in 1922, but were not closely associated with her until 1930. After that time, Mrs. Cover frequently visited Mrs. Sinclair, often, as Mrs. Osborn testified, when the Osborns were not at home, but some times when the Osborns were at home the visits would take place on the porch. It does not appear, however, that this was at the suggestion of Mrs. Cover. The visits were perfectly open, and Mrs Sinclair was, of course, entitled to see her friends at will.

Appellant also argues that Mrs. Cover induced Mrs. Sinclair to change physicians and consult the doctor who had been employed by Mrs. Cover and her mother; that, when Mrs. Sinclair was placed in a con-

valescent home, the Osborns and other friends of Mrs. Sinclair were unable to find where she was or to communicate with her; and that Mrs. Cover refused to tell some of Mrs. Sinclair's friends where that lady was residing. These things, of course, occurred long after the execution of the will of August 2nd, and while affording a possible basis for criticism and suspicion, afford no ground for setting the will aside.

Appellant argues that, because in preparing her last will Mrs. Sinclair did not retain the services of Mr. Rutherford, who had been her attorney for many years, but retained an attorney who had been employed by Mrs. Cover, some inference against the will arises. Such a matter is entitled to consideration, but it must be remembered that, when Mrs. Sinclair executed the will of January 6, 1934, she did not consult Mr. Rutherford, but retained the services of Mr. Chavelle.

Appellant also calls attention to the fact that, by the will of August 2nd, the bulk of Mrs. Sinclair's estate, which it appears was appraised at $2,500, was bequeathed to one who was no relation to the testatrix, to the detriment of appellant, her daughter. In this connection, certain facts must be borne in mind, first, that, of the five wills which Mrs. Sinclair had executed since 1920, in the first Mrs. Osborn was bequeathed practically nothing, in the next one thousand dollars, in the next only one hundred dollars, and only in the fourth will the major portion of Mrs. Sinclair's estate. It also appears beyond question that, whether with or without good reasons, or any reason, Mrs. Sinclair had, to a considerable extent, turned against appellant and her family. Whether or not this feeling on Mrs. Sinclair's part was justified, we do not know, nor is that a matter of vital concern, unless it should appear that that sentiment had been wrongfully occasioned by

some third party, in carrying out some ulterior or improper purpose or motive.

A will cannot be set aside because the testator disinherits a near relative, motivated by reasons which to a court would appear to be entitled to little weight. It nowhere appears in the record that anyone ever influenced Mrs. Sinclair against appellant or her family. The fact that appellant was not informed of her mother's whereabouts when the latter left her home for a hospital or sanitarium, is not of itself sufficient to cast a doubt upon a will which was executed long prior to that time.

Nurses who cared for Mrs. Sinclair and the proprietor of the convalescent home where she was cared for for a considerable period of time, together with her physician, all testified that her mentality was good, and that she was perfectly capable of making her wants and desires known.

Mrs. Sinclair lived a little more than three years after executing the will of August 2, 1935. Of that period, appellant and her family were with her until the middle of the following March. Elizabeth Johnson, a nurse, took care of Mrs. Sinclair, at the latter's home, from April until the following August, and during this period never saw Mrs. Osborn. From September, 1936, until her death two years later, Mrs. Sinclair was a patient in the convalescent home operated by Mrs. Helen Smith, and was cared for by nurses in Mrs. Smith's employ. Mrs. Sinclair was suffering from asthma and bladder trouble, and Elizabeth Johnson, Helen Smith, and Margaret Burke, the nurse who had charge of Mrs. Sinclair, together with Dr. Henry Takacs, who was Mrs. Sinclair's physician, both before and after she went to the convalescent home, all testified that Mrs. Sinclair, during their acquaintance with her, was mentally competent and alert. Mrs. Smith

testified that, while Mrs. Sinclair was a patient under her charge, Mrs. Cover would call on Mrs. Sinclair about once a month, and would send her flowers; that the witness would phone Mrs. Cover, at Mrs. Sinclair's request, and Mrs. Cover would call on Mrs. Sinclair when requested so to do.

There is no direct evidence that Mary Jane Cover ever talked with Mrs. Sinclair about the matter of Mrs. Sinclair's will, or sought in any way to influence Mrs. Sinclair's disposition of her estate.

Appellant argues that the admitted facts raise a strong presumption of undue influence on the part of Mrs. Cover, and that a *prima facie* case against the will was made by the evidence, which was not rebutted by the evidence in favor of the will, appellant arguing that respondent

" . . . failed to introduce any evidence of a clear, impeccable and convincing nature to overcome or overthrow the strong *prima facie* case and presumption of undue influence and fraud raised by the appellant's evidence."

Examination of the record convinces us that the evidence amply supports the holding of the trial court that the will of August 2, 1935, was not induced by fraud or undue influence of Mary Jane Cover, or any other person, and that the will should be sustained as the legal and valid expression of Mrs. Sinclair's testamentary wishes.

The order appealed from is affirmed.

ROBINSON, C. J., MILLARD, SIMPSON, and JEFFERS, JJ., concur.