[1] Reported in 116 P.2d 526.
Anna Miller, a resident of Spokane, Washington, who executed her last will and testament November 22, 1938, died December 21, 1939. The portions of that will pertinent to this appeal read as follows:
"THIRD: I have a son whose name is Thomas H. Miller and I will and bequeath to my said son the sum of One Dollar and no more; this for the reason that my said son has not visited me nor written to me for many, many years last past.
"FOURTH: I have had two daughters, whose names were Etta Knol and Mary G. Driscoll, both of said daughters being now deceased; my daughter, Etta, having left two children, and my daughter, Mary, *Page 260 
having left one child. These grandchildren, however, have not written to me, neither have they visited me in many, many years, therefore, I will and bequeath to each of my grandchildren the sum of One Dollar and no more.
"FIFTH: I make the further provision of One Dollar and no more to each person that may establish the fact that he or she is my child or grandchild.
"SIXTH: All the rest, residue and remainder of my estate, real, personal or mixed, wheresoever situate of which I may die, seized or possessed, or to which I may be entitled at the time of my decease, I will, devise and bequeath to the ST. JOSEPH'S ORPHANAGE OF SPOKANE, WASHINGTON: THE FRANCISCAN MONASTERY OF ST. CLARE, a corporation of Spokane, Washington, and HOUSE OF THE GOOD SHEPHARD, a corporation at Spokane, Washington, share and share alike absolutely, all to be used by them in the State of Washington.
"SEVENTH: I request in consideration of the foregoing bequests that the Fathers and Sisters of the aforesaid institutions pray frequently for the peaceful repose of my soul.
"EIGHTH: I nominate, constitute and appoint the Old National Bank and Union Trust Company, a corporation, of Spokane, Washington, the executor of this my LAST WILL AND TESTAMENT and direct that my estate be settled without the intervention of Court and that said executor shall not be required to give any bond or other security for the faithful discharge of its duty."
Three grandchildren of the deceased instituted this contest to set aside the will on the grounds: (1) That Anna Miller was insane and wholly incompetent to make a will on the date of the execution of the alleged will; and (2) that the instrument alleged to be Anna Miller's last will and testament was the result of undue influence emanating from the beneficiaries under the will and those interested in their behalf, and the executor named in the alleged will and its agents. *Page 261 
The trial court found that, at the time of the making of the will in controversy, Anna Miller was competent to make a will, that the instrument offered in probate was and is Anna Miller's last will and testament, and that she was not acting under the influence of any person whomsoever at the time she executed her will. Decree was entered, denying the petition of the contestants who have appealed from that decree.
Two questions are presented by this appeal: First, did Anna Miller have the mental capacity to make a will November 22, 1938; and, second, was there undue influence at the time of the execution of the will which interfered with the free will of the testatrix and prevented the exercise of judgment and choice?
The facts are summarized as follows: Some time prior to 1900, Anna Miller and her husband, Louis H. Miller, left the state of Michigan and took up their residence in Spokane, Washington, in which city they continuously resided until their deaths.
Two daughters, Etta and Mary, and one son, Thomas H., were born to this couple. The husband, who was a blacksmith or machinist, worked at his trade in Spokane from the time of his arrival in that city until his death in 1927. At that time Mrs. Miller was fifty-nine years old and her husband was twelve or fifteen years her senior. Both members of this marital community, which lived in a small house near one of the meat packing plants and a lumber yard in Spokane, were very miserly. Their daughter Mary, who was then about thirty or thirty-one years old, married C.W. Driscoll, January 5, 1917, at Baker City, Oregon. Mary died in 1931, leaving surviving her daughter, now Ethyl May Bremer, one of the contestants in this proceeding. This grandchild corresponded some with her grandmother, Anna Miller, until 1934 when Ethyl married. Mrs. Miller ceased *Page 262 
to correspond after that time with Ethyl, who never visited, or was visited by, her grandmother. Mrs. Miller had in her possession a photograph of Ethyl May Bremer, taken when the girl was about fourteen years old. No other photograph of any other member of the family was found among Mrs. Miller's effects.
The other daughter, Etta, married Walter Knol, January 18, 1918, at Seattle, Washington, at which time Etta was thirty-three or thirty-four years old. Etta, who died in 1935, was survived by two children, Luella Knol and Walter Jacob Knol, whose ages at the time of the trial of this cause were eighteen and sixteen years of age respectively. During their lifetime they had seen their grandmother only during a period of about one week in 1929. These grandchildren never wrote to their grandmother nor did she ever write to them. Neither Mary nor Etta ever visited their mother or father after they were married, nor did the mother ever visit either of her daughters. A limited correspondence was had between the parents and the daughters. The son, Thomas H., who was born in 1890 or 1892, left home, because of lack of harmony between himself and his parents, when he was twelve or fifteen years of age. In 1922 Tom visited his sister Etta. He wrote to her and her husband a few times subsequent to 1922, but never after 1924. After the daughters, Etta and Mary, died, both Mr. Driscoll and Mr. Knol remarried. When Louis H. Miller, the husband and father, died in 1927, Anna Miller did not inform the daughters of the death of their father until after the funeral. Anna Miller did not attend the funeral of her daughter Mary or of her daughter Etta although she had notice of the death of each.
Mrs. Miller, after the death of her husband, continued to live in the house which she and he had occupied at the time of his death. She kept a few *Page 263 
chickens. She had a small four-wheeled wagon which almost daily she used in traveling from her home to various stores a mile or so distant where she obtained waste vegetables and other discarded material which she took home and cooked for food for her chickens. In the preparation of this chicken feed she would cook the same on her cook stove in the kitchen. She became more miserly, very eccentric, and repulsively filthy in her habits. She obtained from the constituted relief agencies aid on her representation that she was destitute. On her application, she obtained burial relief from the Masonic Order at the time her husband, a Mason, died. Mrs. Miller was of the Catholic faith but rarely attended church.
After the death of her husband she lived a secluded life, and while she visited certain people in the community where she resided she did not permit them to visit her in her home. In February, 1937, she weighed about sixty-eight pounds, which was due to the manner in which she lived. On February 2, 1937, she went to the lumber company next door to her home to request assistance. She was in such physical condition that some one at the office of the lumber company reported the case to the police department. Thereupon she was taken to the city jail where she was bathed and placed in bed under the supervision of the police matron. From thence she was taken to the psychopathic ward in St. Luke's hospital, suffering from malnutrition and hardening of the arteries.
An insanity charge was filed against her and she was held in St. Luke's hospital for treatment and observation for a period of about eight weeks or until April 2, 1937, when she was discharged, without a hearing, by one of the judges for the superior court of Spokane county, who has charge of that class of the county's work. All of the time while Mrs. Miller *Page 264 
was in St. Luke's hospital she was under the care of Dr. Robert H. Southcombe, a psychiatrist, who saw the patient daily and who, through arrangement with Spokane county, had charge of all mental cases for the county.
Mrs. Miller left St. Luke's hospital April 3, 1937, at which time she went to St. Joseph's Home for the aged, a Catholic institution in Spokane. She remained there until the early part of 1938. She then moved to the home of Mrs. Viola Houle where she remained one month and then moved to the home of Helen Vogel. Dissatisfied with that place, she obtained an apartment in an apartment house on east Second avenue in Spokane where she remained until September 8, 1938. On that date, she moved to the Harvard apartments on Third avenue in Spokane where she remained until May, 1939. She next took up her residence in the home of Mrs. Agnes Aronson, where she remained only a short time. She then moved to the home of Mrs. Alice Ingham with whom she remained until she was taken to the hospital with her last illness in December, 1939.
When Mrs. Miller was placed in the psychopathic ward in 1937, a petition was filed for the appointment of a guardian of her estate. The Old National Bank and Union Trust Company was appointed such guardian. At that time the will of her husband, which had not been probated, was found among Mrs. Miller's effects. That will, which was executed in 1923, bequeathed a dollar to each of the three children, the residue to Mrs. Miller, and nominated her executrix without bond. The Old National Bank and Union Trust Company became the administrator and administered the estate of Louis H. Miller. This guardian and administrator were appointed shortly following the time Mrs. Miller was placed in St. Luke's hospital, *Page 265 
at which time it was learned she had an estate of approximately sixty thousand dollars, most of which was in currency and cached in her small home.
While Mrs. Miller was at St. Luke's hospital, a man, who represented himself to be Thomas H. Miller, her son, called to see Mrs. Miller. He remained in Spokane only one day. Mrs. Miller claimed he was not her son. Charles W. Driscoll, a former son-in-law, came to Spokane for a period of one day while Mrs. Miller was in the hospital. Mrs. Miller rapidly responded to treatment after she was placed in St. Luke's hospital and Dr. Southcombe, who attended her, could find no trace of insanity or senility.
After her discharge from the hospital, she went about town as she desired, met, and visited with many of her old friends. In November, 1938, Mrs. Miller informed Miss R. May Wooters, with whom the decedent had been acquainted many years, that she desired to make a will but that she did not have faith in lawyers. Miss Wooters suggested the name of her attorney, James A. Brown, whose address she gave to Mrs. Miller, as a lawyer of ability and integrity. Doubtless to ascertain the correctness of her friend's estimate of the attorney, Mrs. Miller made inquiry of Mr. Hamlin, trust officer of the guardian bank and trust company, concerning Mr. Brown. On assurance of Mr. Hamlin that the lawyer suggested by Miss Wooters was competent and trustworthy, Mrs. Miller called on Mr. Brown, who prepared, as she requested, Mrs. Miller's last will and testament, under which she gave all of her estate, with the exception of four nominal bequests, to St. Joseph's Orphanage of Spokane, the Franciscan Monastery of St. Clare, and House of the Good Shepherd, three Catholic charitable institutions in Spokane, Washington.
The trial court was convinced that, under the facts of this case, the element of unnaturalness was not *Page 266 
present, as by their own conduct the children, or at least the grandchildren, had so far alienated themselves from any affection that may have existed in the heart of this old woman that the element of love and affection could not and did not exist in this case. It did not seem conceivable to the trial court that the two daughters and the son who lived less than three hundred miles distant from their mother should, during all those years, have failed to visit their mother even once. On the one occasion when Mr. Knol took his two children from Bellingham, and was not accompanied by Mrs. Knol, and visited Mrs. Miller, that was the first time that Mrs. Miller had seen those two grandchildren and her son-in-law. Mrs. Miller then manifested, by her refusal to stay at home and entertain them, that she had no affection for them. There was not a photograph, except that of Ethyl Bremer, of another child in the family in Mrs. Miller's home. When one of the daughters died, a telegraphic request to that mother to financially aid in the burial expenses received no response although the mother was able to assist. Mrs. Miller's attitude towards her children and her children's attitude towards their mother remove from the case any question as to the will being unnatural.
[1-3] The disposition by will of one's property is a valuable right which is assured by law. Dean v. Jordan, 194 Wn. 661,79 P.2d 331; In re Schafer's Estate, 8 Wn.2d 517,113 P.2d 41. If, at the time of the execution of the will in controversy, Anna Miller had sufficient mind and memory to intelligently understand the nature of the business in which she was engaged, to comprehend generally the nature and extent of the property which constituted her estate and of which she intended to dispose, and to recollect the objects of her bounty, she was possessed of testamentary *Page 267 
capacity. In re Schafer's Estate, supra. Another rule which should be borne in mind, when considering the evidence in this case, is that where a will, rational on its face, is shown to have been executed in legal form, the law presumes testamentary capacity in the testator or testatrix and that the will speaks his or her wishes. In order to set aside a will the evidence must be cogent and convincing. In re Schafer's Estate, supra.
 [4] Whether a will is natural or unnatural is a question to be determined in each case as warranted by the facts. Mental incapacity on the part of a testator is not presumed on the theory that it was unnatural and unreasonable to execute a will giving all property to a stranger and cutting off one's kin. In the determination of the question what is unjust or unnatural, the history of the testator's family is to be considered and the moral equities and obligations appearing therefrom. A will is unnatural when it is contrary to what the testator, from his known views, feelings, and intentions would have been expected to make. If the will is in accordance with such views, it is not unnatural however much it may differ from ordinary actions of men in similar circumstances. 68 C.J. 477.
When all of the facts are taken into consideration, surely it was perfectly natural for this mother and grandmother, who had not seen her children for more than twenty years, had only heard from them occasionally, and not at all during the last four years of her life, to refuse to devise or bequeath any of her estate to her grandchildren. Her daughters were dead, her sons-in-law had remarried, her son had ignored her since boyhood, and the grandchildren, with the exception of two of them when they were quite small, had never seen her. *Page 268 
 [5] If otherwise mentally sound, one is not incapacitated from making a valid will by reason of his filthy habits, unsociability, and miserliness.
"In his home life he was most unhappy. He was clearly an eccentric, and in some respects very much so, and by reason of his infirmities, as before stated, was at times unfriendly, always unsociable, to say the least. He always seemed untidy in his person and clothing, if not actually filthy, and during many years lived all to himself in the shack before stated. It seems his children did not do anything for him after he was divorced, although one or two sometimes called upon him; and he, even before the divorce, never did anything for them. They did not even know of his last sickness. . . . Eccentricities and idiosyncrasies, however gross, do not constitute insanity, and cannot incapacitate one otherwise mentally sound from making a valid will." In re Hanson's Will, 50 Utah 207, 167 P. 256.
In In re Sinclair's Estate, 8 Wn.2d 611, 113 P.2d 65, in an endeavor to prove that the decedent did not possess testamentary capacity, evidence was introduced to the effect that the decedent was guilty of personal habits (we did not describe them) which were extremely repulsive and she often talked and laughed to herself. We held that the conduct of the decedent, her indifference to some of her former friends, and some failure of memory were not sufficient in themselves to establish the contention that Mrs. Sinclair lacked testamentary capacity at the time she executed the will.
[6] If a condition of general insanity, which is not of a temporary kind, is once shown to exist, its continuance is presumed and the burden of overcoming such presumption by proving mental restoration or a lucid interval, rests upon him who asserts such facts. If the proof of insanity existing before the will is executed consists of an adjudication of insanity, or a *Page 269 
decree declaring the person to be non compos mentis and placing him under guardianship, the presumption is that such person is incompetent to make a will; and the burden is upon the proponent of the will to overcome such presumption, by proving restoration of sanity of the testator or that, at the time of executing the will, the testator had a lucid interval, or that the delusion upon which the adjudication of insanity was based did not affect the will. Dean v. Jordan, 194 Wn. 661, 79 P.2d 331; In reSchafer's Estate, 8 Wn.2d 517, 113 P.2d 41.
The appointment of a guardian for Mrs. Miller's estate, not for her person, in February, 1937, was not an adjudication that Mrs. Miller was insane. She was placed in St. Luke's hospital for observation and treatment. The attending physician and psychiatrist testified that Mrs. Miller was quite emaciated and suffering from high blood pressure when she was admitted to the hospital, but that she rapidly responded to treatment. He further testified that she gave no evidence of hallucinations — the ringing in her ears and her imagining that some one was calling her were not, in his opinion, evidences of insanity; that he saw Mrs. Miller daily during the eight or ten weeks she was in the hospital from which she was discharged, on his recommendation, by the superior court in April, 1937. At that time she was not insane nor was there anything in her condition in 1937 that would cause him to "believe she was insane, let alone progressively insane." He was of the opinion that Mrs. Miller was not "afflicted with senile dementia in any degree whatsoever."
Another physician, who treated Mrs. Miller from May, 1937, until the middle of August of the same year, testified that she had an abnormally high blood pressure but "I would say she was of sound mind." *Page 270 
Another well-known, reputable physician, who treated the testatrix from November, 1938, to March 15, 1939, testified, "I would say that she was a normal person, that is in her right mental faculties, all the time that I knew her."
One witness, who treated her as a dentist from May, 1937, until November of the same year, testified that, during that period of treatment, he never noticed anything in her attitude indicating that Mrs. Miller was not normal mentally. Another physician, who was called as a witness by appellant, testified that he treated Mrs. Miller from March 3, 1938, to November 3, 1938; that she appeared sane as far as he could tell and he did not give her any particular examination that way; that she seemed a little queer, a little different from the ordinary person. One lady had known the deceased a long time prior to the date she was taken to St. Luke's hospital, and afterward saw Mrs. Miller frequently. She testified there was nothing about the attitude or demeanor of Mrs. Miller in those years after she left the hospital to indicate that she was insane. Other witnesses, who were acquainted with Mrs. Miller, testified to the same effect.
[7] If we assume for the sake of argument that a presumption arose by reason of the appointment of a guardian of the estate of Mrs. Miller at the time she was placed in St. Luke's hospital early in 1937, such presumption has been overcome by competent testimony. She was sent to the hospital because of her physical rather than her mental condition. She was stingy and eccentric. She was emaciated and suffering from malnutrition, but her improvement was rapid when she received proper food and treatment. None of the physicians who treated her testified other than that she was sane, and the treatment by these physicians was for the period of approximately the *Page 271 
last two years of Mrs. Miller's life and the particular period when the will was executed.
One physician, thirty-one years of age, from a neighboring state, called as an expert witness for the contestants, and who had been practicing in that state for two years, testified in response to a lengthy hypothetical question that Mrs. Miller was insane. As aptly observed by the supreme court of California inIn re Collins' Estate, 174 Cal. 663, 164 P. 1110:
"At best, the testimony of expert witnesses as to insanity, based on hypothetical questions skillfully framed to call for an answer favorable to the party in whose behalf it is asked, `is evidence the weakest and most unsatisfactory.' (Estate ofDolbeer, 149 Cal. 227, 243, [9 Ann. Cas. 795, 86 P. 695].) When, as in this case, the opinions as to unsoundness of mind, including those of the intimate acquaintances, are based on facts which show neither morbid delusion nor total mental incapacity, which prove nothing more than personal peculiarities and habits, accompanied by physical weakness, occasional lapses or failure of memory and defective nervous and muscular co-ordination, and it clearly appears that none of these frailties was present at the time of the execution of the will or affected its provisions in any way, the evidence is wholly insufficient to establish the fact."
In Points v. Nier, 91 Wn. 20, 28, 157 P. 44, Ann. Cas. 1918A, 1046, we said:
"We hold the view that the right to dispose of one's property by will is one assured by the law and is a valuable incident to ownership, and does not depend upon its judicious use. In reMcDevitt, 95 Cal. 17, 30 P. 101. As to proof of the competency of the maker, it is stated in 14 Ency. of Evidence, p. 369:
"`The testimony of attending physicians is entitled to great and peculiar weight. It may overcome the testimony of lay witnesses if based on personal observation and knowledge, or that of experts based on hypothetical questions; but not that of an uncontradicted witness as to what testator actually did in connection *Page 272 
with the preparation of the will, or that afforded by proof of success in business matters.'
"In the same work, page 390, it is said:
"`It is the function of subscribing witnesses to inspect and judge the mental condition of the testator before they sign the will. It is presumed that such witnesses performed their duty. The fact may be inquired into on their cross-examination. Hence peculiar weight is given their testimony if it is in accordance with their attestation, and it is often disparaged if it differs therefrom.'
"The trial court, having had the benefit of seeing and judging of the demeanor, as well as hearing and weighing the testimony, of all the witnesses in this matter, found in favor of the competency of the testatrix. Without some circumstances or evidence preponderating against that testimony and the finding of the court thereon, we cannot overturn it."
The subscribing witnesses to the will were James A. Brown (attorney for respondent executor), who drew the will, and E.D. Weller, an attorney and office associate of Mr. Brown. Each has an excellent reputation as a citizen and professionally. Their testimony is entitled to weight. There is no legal objection to the practice of the attorney who draws a will to act as a witness to that will. In re Riley's Estate, 163 Wn. 119,300 P. 159. Both witnesses questioned Mrs. Miller. The will was read to her by Mr. Brown and she expressed her satisfaction with it. She informed each of the witnesses as to the amount of her estate, and told them that her children and grandchildren had never done anything for her, that they did not visit her nor write to her, and that she wanted to leave her estate where it was going to do some good.
Mrs. Miller's will was executed about twenty months subsequent to the time she was placed in St. Luke's hospital. The police matron of the city of Spokane, who was called as a witness by the contestants, testified *Page 273 
that she saw Mrs. Miller at St. Luke's hospital and at St. Joseph's Home. In fact, she had seen Mrs. Miller out walking several times since 1937. Mrs. Miller recognized the matron each time they met and the former frequently visited the latter at the jail. "She said she had disowned her boy and just wasn't interested in him at all." The case at bar is quite similar toIn re McGhee's Estate, 188 Wn. 550, 62 P.2d 1336. On appeal from a judgment sustaining a contest, we reversed the judgment and directed that the will be admitted to probate. With few changes, the language we there used could appropriately be employed in the case at bar.
"As might be expected, in the case of an old man, neglected and deserted, there were things testified to as having been said or done by the decedent that, in the opinions of witnesses, indicated that the testator was not capable of making a will.
"On the contrary, as testified to by a great number of the most intimate and well-informed neighbors and acquaintances of his, there was nothing of serious moment tending to show inability on the part of the testator to make a valid will. . . .
"One may do or say unusual things at one time, while at other times, for long periods of time, he may say or do nothing at all out of the ordinary. The particular point of time that is important in a case like this is the time at which the will was executed. There is no testimony in this case against the testator's mental condition the day the will was written."
[8] The evidence that Mrs. Miller suffered from hallucinations and delusions, which conflicts with the testimony of the psychiatrist and attending physician who found nothing indicative of either, does not go so far as to connect any of the hallucinations or delusions, mentioned by appellants, with the will or any part of the will. Even if Mrs. Miller suffered from hallucinations and delusions, unless they are related *Page 274 
to the provisions of the will they are not material. It would not be sufficient to establish merely that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion. Rollins v. Smith, 72 Cal.App. 773,238 P. 171. The only delusion or hallucination claimed by appellants is that, at the time she went to the police station, she thought she had been robbed and that three people came to her house and told her they intended to rob her, coupled with the fact that, at various times after she had been to the hospital and while she was suffering from high blood pressure, she could hear people calling her name "Anna Miller." Conceding,arguendo, that these are properly designated delusions or hallucinations, there is nothing in the record to establish that the delusions or hallucinations bore directly upon and influenced the terms of the last will and testament of Anna Miller.
The evidence does not preponderate against the finding of the trial court that, at the time of making the will of November 22, 1938, Anna Miller had the required testamentary capacity.
[9] The contention that the last will and testament was the result of undue influence on the part of the beneficiaries under the will and those interested in behalf of those beneficiaries which prevented Anna Miller from the exercise of judgment and choice, is without merit. The rule is that in order to vitiate a will there must be something more than mere influence. Dean v.Jordan, 194 Wn. 661, 79 P.2d 331.
"There must have been undue influence at the time of thetestamentary act, which interfered with the free will of thetestator and prevented the exercise of judgment and choice." Inre Shafer's Estate, 8 Wn.2d 517, 113 P.2d 41. *Page 275 
There was no fiduciary or confidential relationship existing between the testatrix and the beneficiaries named in her will. The record does not disclose that any member of the Catholic church, of which the testatrix had not been a regular attendant although she was a Catholic, ever solicited the testatrix for a bequest other than the testimony of one or two witnesses, who said she had told them "the Catholics were after her money." The trust officer of respondent executor is a Catholic, but he is not a member of the board of any of the beneficiary institutions. He never even suggested to her that she make a bequest to any of these institutions. No opportunity has been shown when undue influence could have been exercised. Mrs. Miller, after she left the St. Joseph's Home for the aged, resided in places which were not owned or operated by Catholics and places in which the beneficiary institutions were not interested in the slightest degree. Mrs. Miller, as recited above, called at the office of James A. Brown, who is not a Catholic, on the advice of an old friend who was a client of Mr. Brown. That friend of Mrs. Miller is not a Catholic.
An old, lonely woman, who had had few joys in this life and had no blood relatives for whom she had any affection or who had any love for her, was close to the end of life's journey. She had not, through the years, conformed to the requirements of the religious organization of which she was a member. It is likely that she desired to atone for her failure to approximate the standard of her church. So motivated, and feeling that perhaps the hereafter would be more pleasant for her than this world had been, she devised and bequeathed her estate to three charitable Catholic institutions and requested that the Fathers and Sisters in those institutions pray for the repose of her soul. *Page 276 
Whatever her motive, she had testamentary capacity and there is no showing of undue influence on the part of the beneficiaries or by any one interested on behalf of the beneficiaries. Mrs. Miller exercised the right, which was hers, to disinherit her grandchildren and leave her property to the institutions named.
"The right of a testator to dispose of his estate, depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust." Clapp v. Fullerton, 34 N.Y. 190, 90 Am. Dec. 681.
"He may disinherit either wholly or partially his children and leave his property to strangers to gratify his spite, or charities to gratify his pride, and we must give effect to his will, however much we may condemn the course he has pursued."Boughton v. Knight, 6 Moak, Eng. Rep. 349.
The foregoing quotations were cited with approval by us inHunt v. Phillips, 34 Wn. 362, 75 P. 970.
The judgment is affirmed.
ROBINSON, C.J., BEALS, SIMPSON, and JEFFERS, JJ., concur. *Page 277