[No. 14541. *En Banc.* December 19, 1918.]

*In the Matter of the Estate of* AGNES GEISSLER.
AGNES M. WEBER, *Respondent,* v. FRANK J.
GEISSLER *et al., Appellants,* IRENE
MAY GEISSLER, *Respondent.*[1]

APPEAL (149)—PRESERVATION OF GROUNDS — EXCEPTIONS — FORM
AND SUFFICIENCY. Exceptions to findings, orally announced at the
time the findings were made, are not inconsistent with orderly
practice, and may be sufficient to warrant a review on appeal, not-
withstanding that a showing of failure to specify the particular
findings excepted to is supported by the court's failure to note the
exceptions at the time.

WILLS (7)—TESTAMENTARY CAPACITY — EVIDENCE — SUFFICIENCY.
The evidence sustains findings of mental competency and lack of
duress or undue influence in the making of a will, where, sick unto
death, and at times delirious and under the influence of drugs,
the testatrix made a will in favor of her husband, named all her
children, giving each $50, and the evidence of those in attendance
was to the effect that her mind was clear and that she had a
perfect understanding of her property; since wills are favored
in the law and the testimony to overthrow them must be cogent
and convincing.

Appeal from a judgment of the superior court for
Adams county, Truax, J., entered September 25, 1917,
upon findings in favor of the plaintiff, in an action
to contest a will, tried to the court and a jury. Re-
versed.

*W. M. Nevins* and *Merritt, Lantry & Merritt,* for
appellants.

*Zent & Powell,* for respondent.

CHADWICK, J.—Agnes Geissler died January 27,
1916, in Adams county, Washington. She left a will
which was admitted to probate on the 13th day of
March, 1916. On the 29th day of September, 1916,
Agnes M. Weber, daughter of the deceased, filed a

[1]Reported in 177 Pac. 330.

petition in the superior court asking that a citation issue to the executor and the heirs and devisees of her mother to show cause why the will should not be set aside and held for naught upon the ground that the will had been executed at a time when her mother was mentally incompetent to understand the contents of the will; that she did not sign it as her free and voluntary act, but at the dictation and under the menace, duress, fraud and deceit of Frank J. Geissler, her husband, to whom the property was all left, save a specific legacy of $50 to each one of her children, including the contestant.

The petitioner further alleged that it was the wish and desire and purpose of her mother, when in her right mind and in the full possession of her mental faculties, to distribute her community interest in the property among her four children, share and share alike. The facts will be argued in the body of the opinion. The first question confronting us is whether the case is properly before us, it being urged by counsel for the contestant, in whose favor judgment was entered, that counsel for the contestees did not save any exceptions to the findings made by the court. The history of this feature of the case is fully outlined in our opinion in *In re Geissler's Estate*, 99 Wash. 452, 169 Pac. 822. It is there suggested that the question should be passed to the merits. Without further discussion we hold, in aid of our appellate jurisdiction and upon the showing made, that counsel for the contestees announced to the court, at the time findings were made, that they excepted to such findings; this being not inconsistent with orderly practice, and counsel being experienced lawyers familiar with appellate practice. The showing on the other hand would indicate that, although it was announced that exceptions were reserved, counsel did not specify the particular

findings to which they excepted. This position is sustained in that the trial judge did not note the exceptions at the time. The conflicting certificates of the trial judge are referred to in our former opinion. This being the state of the record, and being disinclined to deny an appeal where we are convinced that both sides are sincere, and that the situation comes not from neglect or a selfish disposition to deny a right, but from a misunderstanding, we are inclined to hold that the case is properly before us.

The contestant produced the attending physicians, Dr. Ganson and Dr. Burroughs, who had been called in consultation on the day that the will was executed, as witnesses. As suggested in our former opinion, the case was tried before a jury, which found in favor of the contestant. The trial judge adopted the findings of the jury, but also filed a memorandum of opinion in which he says that the testimony clearly preponderates in favor of the mental capacity of the deceased at the time the will was executed, if we are to reject the testimony of the physicians. Counsel for the contestees persistently objected to the admission of the testimony of the physicians, claiming that they came within the rule of privilege as declared by Rem. Code, § 1214.

It was held below that the contest of the will, being a matter in probate, was not a civil action within the meaning of the statute, and that the physicians were therefore qualified.

Much of the briefs is made up of an argument of this question, but being convinced that the facts preponderate in favor of the will, with as well as without the testimony of the physicians, we will pass that question and consider the case as if the physicians were unquestionably qualified.

Mrs. Geissler had been sick for about a year. She

had gone to Spokane in the fall for an operation. When the doctors came to operate they found her condition to be such that the hope of benefiting her was abandoned and she was moved back to her home. The operation revealed a cancerous condition of the uterus, bladder, and pelvic organs, from which uremic poisoning developed. This condition, according to the testimony of Dr. Burroughs, brings on convulsions which are followed by coma; that is, stupor and insensibility. It is in evidence, too, that the attending physician had prescribed morphine and hyoscin, and that these remedies would benumb the nervous system and impair the acumen of the mind and cause hallucinations and drowsiness when coming out from under the influence of the drugs.

Of her mental condition, the attending physician, Dr. Ganson, testified in a general way:

"She was usually able to recognize me. Her mental condition was quite misleading. At times I would think she was quite rational, and then she would go off to one of those periods of flightiness. She was conscious but delirious."

The will was executed on the afternoon of December 22. The doctor says:

"She met Dr. Burroughs and shook hands and talked to him. She knew Dr. Burroughs and she knew me, but I had talked to her in the morning and she was delirious at that time."

To the direct question whether she was in such mental state as to know her property, her will, and the object of her bounty, Dr. Ganson says:

"I had no means of knowing positively as to whether she was under this influence or not. She knew part of what she said, and at the same time in the same conversation she would go off into a delirium, so it was impossible for me to tell whether she recognized these things or not."

And on cross-examination he testified:

"Q. Doctor, do you think from what you saw of her at that time, do you think that, on the morning of the 22nd, she would be in such a condition of mind as to know her relatives and know what property she had? A. I don't know. Q. You would not say that she was not in that condition of mind? A. I would not say that she was not. No, sir."

To a like general question, Dr. Burroughs answered:

"A. I think that comes under the head of expert witnesses and I don't know as I care to qualify as an expert. Q. We have both expert and inexpert. Just simply give your opinion, Doctor, as to what the situation was. A. In my opinion, she was not."

And upon cross-examination he testified:

"Q. But is there at any time a time in a patient who is in a state of uremic poisoning when the effect of it might pass off, and the mind be clear? A. There might be at intervals. Q. Would you say, on the morning of the 22nd of December, 1915, that Mrs. Geissler was not in a condition to know her children? A. I did not know her condition in the morning. I saw her in the afternoon. Q. From what you saw in the afternoon, state whether or not, in your opinion, she would be in such condition on the morning of the 22nd of December as to know her children? A. Probably she would at intervals. Q. And her husband? A. She probably would. Q. And to know what she desired to do with that property? A. She might do that."

On re-direct examination to the question, "That would be possible, but not probable, as I understand it?" Dr. Burroughs said: "I guess that's it."

Wills are favored in the law, and it is a cardinal principle of construction that the testimony to overcome them must be cogent and convincing. The testimony of all of those who were in attendance at the time the will was executed is to the effect that Mrs. Geissler's mind was clear and that she had perfect un-

derstanding of her property and the disposition that she desired to make of it. Upon the suggestion of the draftsman of the will that it would be necessary for her to make some provision for her children, she named each of them giving their ages. She also made reference to a child that had died and had been buried a day or two before, suggesting that it would not be necessary to leave anything to him. She had stated to other witnesses that, inasmuch as she and her husband had earned the property together, she wanted him to have the whole of it when she died. Neighbors who saw her during her illness generally concur that she was competent and, barring the time when she was under the influence of the drugs which were given her from time to time to allay her pain and suffering, that her mind was bright and active. The nurse who was in attendance upon Mrs. Geissler testified that she was present when Mrs. Geissler signed the will and that "she was in a right clear state of mind at the time she signed it." It was her opinion that she well knew her own mind, her property, and what she desired done with it after her death.

An expert physician was called and, upon a hypothetical question covering the facts of the case, expressed the unqualified opinion that Mrs. Geissler was in a competent mental condition. The only testimony to the contrary is the testimony of the contestant and her husband and of some witnesses whose testimony is little more than hearsay.

The charge that Mrs. Geissler was acting under duress or was the victim of fraud and deceit was not sustained in any degree. Nor do we find anything in the record that would sustain a finding that Mrs. Geissler had ever said that she intended to leave her property to her children. But if she had, being competent, she was privileged to change her mind. Nor

can an inference of incapacity be drawn from the fact that she left her property to her husband. Her act was neither unnatural nor unusual. On the contrary, it is quite common under our community property system for one spouse to will the entire estate to the other, a fact of which we might well take judicial notice if the issue were otherwise doubtful.

There are two circumstances that are urged as evidentiary facts having a sufficient weight to influence the judgment of this court. The one is that Mrs. Geissler, when writing her signature to the will, wrote the name Geissler, G-e-i-s-s-s-l-e-r, and that this misprision would indicate an imperfect or non-understanding mind. But the testimony shows that Mrs. Geissler herself immediately called attention to the fact, saying: "I have gone and put one too many s' in it," and asked how her error might be corrected. The draftsman, the banker at Odessa, an old and familiar friend, suggested that she draw her pen through the misspelled signature and write her name below. This she did. The signature is written in a bold, clear hand. There are no evidences of tremor or hesitation. Looking at her signature it would be hard to believe that Mrs. Geissler could have written a plainer, better hand were she entirely well; or, to state it in another way, she could not have written her name as it is written if she were delirious or under the influence of drugs, or a subject of duress.

The other circumstance is the alleged change in form of a receipt for money. The contestant was paid $40, for which Mr. Geissler took her receipt. Contestant claims that this $40 was a loan. Mr. Geissler insists that it was the balance of her legacy. He had previously paid her $10. The receipt has written in it "In full for inheritance." It is contended that the words "In full for inheritance" are in a different hand-

writing and were inserted fraudulently by Mr. Geissler and his daughter Emily. It is agreed that the receipt was in other respects written by the contestant, Agnes Weber. But we are of the opinion that we are not called upon to settle this controversy. It may be true, and it may be that the jury which was called to advise the court were in some degree influenced by the fact, that the words complained of were, as certain expert witnesses believe, written by the contestant's sister, Emily. But this is a collateral question and can have only slight, if any, bearing upon the main question whether Mrs. Geissler was in a disposing state of mind at the time the will was executed. What may have been done three months after her death by any of the parties can have no effect unless, if the collateral fact were proven, it would tend to discredit the testimony of Mr. Geissler and his daughter. But since there is abundant testimony to sustain the will without resorting to the testimony of either of these witnesses, it would do violence to settled principles to reject that which is fairly certain for that which may forever remain a matter of doubt.

The judgment of the lower court is reversed, and the cause will be remanded with directions to administer the estate under the will.

MACKINTOSH, HOLCOMB, MITCHELL, and MOUNT, JJ., concur.