[No. 26591.   Department Two.   August 23, 1937.]

*In the Matter of the Estate of* HENRY LARSEN,
*Deceased.*

OLE OLSON, *Appellant,* v. CHRIS LANE, *Respondent.*[1]

*Spencer Gray, Earle C. Lassen,* and *J. Elwood Peterson,* for appellant.

*J. P. Wall* and *Lloyd R. Savage,* for respondent.

HOLCOMB, J.—The essential undisputed facts to present the point under consideration are these:

This is a will contest.  The deceased, Henry Larsen, who died testate on February 10, 1936, was a Norwegian fisherman and lived for a number of years prior to his demise on a boat named "Get" in King county. Decedent's will was admitted to probate February 10, 1936.  The inventory and appraisement show the assets of his estate consist of two bank accounts, one in the Canadian Bank of Commerce of Seattle in the sum of

[1]Reported in 71 P. (2d) 47.

$2,739.69, and one in the Seattle-First National Bank in the sum of $2,756.90.

The record shows that respondent secured possession of $125 in gold from Larsen on the boat "Get" about a week before Christmas in 1935. On December 28, 1935, decedent executed a bill of sale of the "Get," and an assignment of his account in the Washington Mutual Savings Bank of Seattle, Washington, to respondent.

On December 2, 1926, Larsen executed a last will and testament. Pursuant to the second article of this will, after the payment of the debts, taxes, funeral expenses, and costs of administration of the estate, the residue of the estate was to become the property of one Ole Olson, a stranger to the blood of the testator. About nine years later, on December 28, 1935, decedent executed another last will and testament, appointing one Chris Lane executor, and in the third paragraph thereof designated Lane, who also bears no blood relationship to the testator, the sole beneficiary after the expense of the probate of this will had been paid. The beneficiaries mentioned in the two respective wills had both been friends of decedent for many years. The wife of decedent had predeceased him many years, and he had no children.

We now consider the disputed facts. Appellant asserts that decedent was not of a sound and disposing mind or capable of executing a will or transacting business and therefore did not possess the necessary testamentary capacity to execute a last will and testament on December 28, 1935; and that its execution was due to duress and undue influence exerted by Lane over the testator. Appellant also urges that the $125 in gold was surreptitiously and fraudulently secured, and that the bill of sale and assignment are invalid because decedent did not have sufficient command of his faculties when these instruments were executed.

Respondent, however, contends that Larsen was mentally and physically competent to make a will, possessed the necessary testamentary capacity, and was not unduly influenced in the preparation and execution of the last will and testament dated December 28, 1935. Respondent asserts that the gold in question was rightfully given to him, and that decedent freely and voluntarily executed the bill of sale and assignment and was in command of his faculties at the time of their execution. There is some uncertainty as to the exact age of decedent at the time of the execution of the later will, but it quite definitely appears that he was something in excess of ninety years of age at that time.

The trial court, under these facts, ordered the petition of Ole Olson for contest of will, contesting the last will and testament of Henry Larsen, deceased, be denied and dismissed with prejudice. The trial court held the last will and testament of decedent of December 28, 1935, having been admitted to probate on February 10, 1936, as the last will and testament of Henry Larsen, deceased, to be his last will and testament, and the probate thereof was in all respects confirmed and approved. A motion for a new trial was denied.

In the brief of appellant, two assignments of error are presented: (1) That the court erred in refusing to set aside the will of December 28, 1935, for lack of testamentary capacity and undue influence, and in dismissing appellant's petition; and (2) in denying appellant's motion for a new trial.

The rules of law applicable to the instant case are clear, but the difficulty arises with respect to their application. It is well recognized that the right to dispose of one's property by will is a valuable incident of ownership, and the intent expressed therein by the

testator should not be rendered ineffective unless the facts clearly require the same. *Pond's Estate v. Faust,* 95 Wash. 346, 163 Pac. 753; *In re Murphy's Estate,* 98 Wash. 548, 168 Pac. 175.

In *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682, we said:

"Wills are favored in the law, and it is a cardinal principle of construction that the testimony to overcome them must be cogent and convincing. *In re Geissler's Estate,* 104 Wash. 452, 177 Pac. 330. Where the will, rational on the face of it, is shown to have been executed in legal form, the law presumes testamentary capacity."

At the outset, it should be remembered that the burden of proof is on the contestant to establish the incapacity of the testator.

Rem. Rev. Stat., § 1387 [P. C. § 10019], provides:

"In any such contest proceedings the previous order of the court probating, or refusing to probate, such will shall be prima facie evidence of the legality of such will, if probated, or its illegality, if rejected, and the burden of proving the illegality of such will, if probated, or the legality of such will, if rejected by the court, shall rest upon the person contesting such probation or rejection of the will."

See *Points v. Nier,* 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A 1046; *In re Adin's Estate,* 112 Wash. 379, 192 Pac. 887; *In. re Roy's Estate, supra; In re Williams' Estate,* 142 Wash. 637, 254 Pac. 236.

We now consider the testamentary capacity of Larsen and whether undue influence attended the preparation and execution of his will.

The rule in regard to testamentary capacity has been stated by us in *Hartley v. Lord,* 38 Wash. 221, 80 Pac. 433:

"The rule of testamentary capacity is that the testator must have sufficient mind and memory to intel-

ligently understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property which constitutes his estate, and which he intends to dispose of, and to recollect the objects of his bounty. Underhill, Wills, § 87; Schouler, Wills (3d ed.), § 68."

"Neither weakness nor approaching death of themselves render the testator incompetent to make a will. If, in spite of his weakness of body, he has sufficient mental capacity to be able to know and understand the nature and extent of his property, the natural, proper objects of his bounty and the nature of the act which he is about to perform, he has sufficient capacity to make a valid will, even if the disease will eventually destroy testamentary capacity." 1 Page on Wills (2d ed.), § 163, 277.

The precise point at which reason is impaired is often most difficult of ascertainment. It is futile to attempt to select an arbitary test or formula of mental capacity by which to measure testamentary capacity, since there is no uniform rule capable of application apart from the facts of each particular case. Old age alone does not deprive the testator of the power to make a will. 1 Page on Wills (2d ed.), § 137, 231; § 147, 255.

"The quantum of mental capacity requisite to the valid execution of a will has been stated to be knowledge and understanding by the testator of the nature and consquences of his act." 68 C. J. § 23, 424.

"Other than the requirement that the testator have mind sufficient to know and understand certain facts prescribed as essential, there is no particular degree of mentality constituting a standard for testamentary capacity, so that the existence of capacity must be determined largely on the facts and circumstances of each particular case. It is not necessary that the testator possess a high order of intelligence or an absolutely sound mind in all respects; mere intellectual feebleness does not disqualify a person to make a will." 68 C. J. § 24b, 429.

The mere fact a person is sick does not render him incapable of effecting a testamentary disposition. *In re Ellis' Estate,* 143 Wash. 142, 254 Pac. 837. By reason of the decedent's advanced age, some of Larsen's actions were somewhat eccentric and the disintegration of the mental and physical processes had set in, but we are not convinced that they were impaired to the point that he did not have sufficient possession of his faculties to execute a will.

It is not open to question that one is free to draft a new will and to change the objects of his bounty at any time so long as he has the capacity to do so. *In re Zelinsky's Estate, infra.*

This court is committed to the view that to vitiate a will there must be more than influence. It must be undue influence at the time of the testamentary act which deprived the testator of free will agency and prevented the exercise of judgment and choice. *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515; *In re Roy's Estate, supra.*

*In re Seattle's Estate,* 138 Wash. 656, 244 Pac. 964, this court said:

" ' "The result of the best considered cases upon the subject seems to put a quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should at the time of executing the will know and understand what he was about." '

"This view of the law, stated in substance but in somewhat varying terms, has been repeated and adhered to by this court in numerous later decisions, among which may be noted the following: *Jasinto v. Hamblen,* 79 Wash. 590, 140 Pac. 677; *Points v. Nier,* 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A 1046; *In re Geissler's Estate,* 104 Wash. 452, 177 Pac. 330.

". . . In *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515, Judge Crow, speaking for the court, said:

" 'To vitiate the will an influence must be shown which at the time of the testamentary act, controlled the volition of the testator, deprived him of free will agency, and prevented an exercise of his judgment and choice.' "

Suspicion of undue influence is not enough. *In re Patterson's Estate, supra; In re Bradley's Estate,* 187 Wash. 221, 59 P. (2d) 1129.

"When the charge of undue influence is made, the question is akin to that of fraud, and testimony to overcome the will must be cogent and convincing. . . ." *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47.

See, also, *In re Zelinsky's Estate,* 130 Wash. 165, 227 Pac. 507.

"To make a good will, a man must be a free agent. But all influences are not unlawful. Persuasion, appeals to the affections or ties of kindred, to a sentiment of gratitude for past services, or pity for future destitution, or the like,—these are all legitimate and may be fairly pressed on the testator. On the other hand, pressure, of whatever character, whether acting on the fears or the hopes, if so exerted as to overpower the volition without convincing the judgment, is a species of restraint under which no valid will can be made." Rood on Wills (2d ed.), § 183, 142.

In an oral opinion, the trial court concluded:

"The burden is upon the petitioner here to develop by clear evidence want of capacity on the part of Larsen at the time he made the will, and, as I have suggested, while the court will always have a certain amount of uncertainty on the subject, a certain amount of doubt, I am obliged to find under all of the evidence that the petitioner has not sustained that burden. . . ."

We have carefully examined the record and feel that no particular good could be accomplished by giving a detailed recital of the testimony. Although we find the testimony conflicting and that of some

witnesses unsatisfactory, we are impelled to the view that the case, viewed as a whole, with all its attendant and controlling circumstances, preponderates against appellant, and appellant has not sustained the burden of establishing the incapacity of Larsen at the time he executed the will in question or in establishing sufficient undue influence to warrant setting the will aside. Appellant has not met the burden placed upon him, and if we are in doubt as to the preponderance of the facts, our decision must necessarily go against appellant. *Marney v. Industrial Ins. Dept.*, 98 Wash. 483, 167 Pac. 1085. We are unable to find that the bill of sale and assignment were secured by fraud or undue influence, or that the gold was unlawfully obtained.

Two doctors testified for contestant. Dr. McClain, who is at least as competent and distinguished as either of the doctors for contestant, testified that he visited Larsen on December 24, 1935, four days before the will was executed, and Larsen answered all questions, conversed with him intelligently, and gave him his symptoms, his history, and the doctor noted nothing at all wrong with him then. There was no evidence of dementia at that time and no evidence of the effects of old age other than that normally noticeable in a person of his age, but not noticable on his mind.

Fishermen friends of Larsen's, who witnessed the will, testified that he was mentally competent. The most telling testimony, to our minds, was that of Thomas Burns, an officer of the bank where Larsen had his account and produced by appellant, who testified, without contradiction, that on January 2, 1936, Larsen appeared at his bank and signed a joint account card without any assistance and knew what he was doing; *that he answered all questions on the signature card.* Burns explained the nature of the joint account

to Larsen and said that Larsen definitely stated that was what he wanted. This transpired some four or five days after the will had been made. Obviously, Burns would be extremely cautious about such a transaction because of the age of Larsen and would be anxious to preserve the bank from any liability.

The above and other disinterested testimony in the record is convincing that there was no senile dementia in Larsen at the time he made the will and at the time he made the assignment of the account.

Since the right to dispose of property by will is a valuable property right, and inasmuch as the trial court had the advantage in hearing the witnesses and the inflection of their voices, in observing their demeanor and candor, sympathy or bias, and the surrounding circumstances attending the trial, we are compelled to sustain the decision of the trial court, by reason of the fact that the case practically hinges on the credibility and capacity of witnesses. *Pond's Estate v. Faust, supra.*

We have critically examined the testimony of the witnesses to decedent's last will, together with other testimony relating thereto, and we are convinced that Rem. Rev. Stat., § 1395 [P. C. § 10022], has been complied with and the witnesses appreciated the duty requested of them.

We have also examined all of the authorities cited by appellant and find that, on their facts, they are distinguishable from the case at bar.

We conclude that the trial court did not abuse its discretion in denying a new trial, and the judgment is accordingly affirmed.

STEINERT, C. J., BLAKE, and ROBINSON, JJ., concur.

BEALS, J. (dissenting)—As is well stated in the majority opinion, there is no arbitrary test or formula

by which testamentary capacity can be measured. Each case must be decided on its own facts.

In the case at bar, it appears that Henry Larsen, whose will is here under attack, was ninety years of age, and suffering from senile dementia. He made the will which the trial court sustained, December 28, 1935, and died February 10, 1936. In my opinion, the evidence clearly indicates that, during the fall of 1935, Mr. Larsen exhibited positive signs of such physical and mental decay as to show a complete lack of testamentary capacity at the time he executed the will which the trial court upheld. The beneficiary under this will was not a particularly intimate friend of the testator, and the circumstances under which the will was prepared, as I read the testimony, well nigh demonstrate that it was the will of the beneficiary, and not of Mr. Larsen.

It clearly appears from the evidence that Chris Lane, the beneficiary under the later will, after the making of this will, paid little attention to Mr. Larsen, and apparently was interested only in such material gain as might accrue to him from the old gentleman's estate. One of the nurses who cared for Mr. Larsen at the hospital testified that Mr. Lane several times asked her how long she thought Mr. Larsen would live, and on one occasion said, "Well, if anything should happen, call this number," to which the nurse replied, "Will you be there?" Mr. Lane answering, "No, it is the funeral parlor." The trial court, in referring to Mr. Lane's testimony, remarked:.

"He makes a very poor witness, and either can't remember or won't remember things that occurred from time to time, on which he has made to some degree conflicting statements."

Even disregarding the matter of undue influence, I am convinced that the medical and other evidence

show conclusively that Mr. Larsen, when he made the will here in question, was utterly lacking in testamentary capacity.

The majority relies strongly upon the evidence of Mr. Thomas Burns, an officer of the savings bank where Mr. Larsen carried his account. Mr. Burns testified that when Mr. Larsen, with Mr. Lane, came to the bank to make his savings account a joint account to the order of himself and Mr. Lane, Mr. Larsen had difficulty in signing his name, writing first simply "Hen Lars." It seems to me that Mr. Burns, when later in his testimony he described Mr. Larsen as "a feeble old man," summed up with remarkable accuracy the situation as it appeared to him.

Dr. N. A. Johanson, who has practiced medicine in Seattle since 1907, and who was very well acquainted with Mr. Larsen for about fifteen years, testified that, when he saw Mr. Larsen in the hospital January 5, 1936, Mr. Larsen had changed completely, and was, in fact, a different man. Apparently he had not bathed or even washed his hands for weeks, his clothing was dirty, he was mentally confused and could not conduct a connected conversation. The doctor diagnosed Mr. Larsen's condition as "general senility," and testified positively that, in Mr. Larsen's condition, he should not transact any business, and that he was not of a "sound and disposing mind;" that it was necessary to restrain Mr. Larsen in bed, as he was obsessed with the idea that he should go back to his boat. The witness also stated that there could not have been any great difference between Mr. Larsen's condition January 5, 1936, and his condition on December 28th preceding.

Dr. Norgore testified that he has practiced medicine in the state of Washington for eight years; that he was called to attend Mr. Larsen December 27, 1935; that he found Mr. Larsen, whom he had never previ-

ously met, in bed, and gave him a thorough examination; that, on talking to Mr. Larsen, he found that the latter was mentally confused; that the doctor's diagnosis was that Mr. Larsen was suffering from chronic myocarditis and senile dementia.

Dr. McClain, whose testimony is relied upon by the majority, visited Mr. Larsen December 24, 1935. He stated that, in his opinion, at this time Mr. Larsen was competent to understand the nature and making of a will. He stated that he spent about fifteen minutes in examining Mr. Larsen, and did not see him again. To my mind, the testimony of the other physicians as to Mr. Larsen's condition is much more convincing than that of Dr. McClain.

In my opinion, the contest against the will of December 28, 1935, should be sustained, and I accordingly dissent from the conclusion reached by the majority.