[No. 30901. Department One. July 28, 1949.]

MATHEA SEVERSON, *Appellant*, v. THE FIRST BAPTIST CHURCH OF EVERETT *et al.*, *Respondents.*[1]

*Lloyd Holtz*, for appellant.
*Elliott & Lee* and *Leslie A. Lechner*, for respondents.

JEFFERS, C. J.—This action was instituted by Mathea Severson against The First Baptist Church of Everett, a corporation, Roosevelt Erickson and wife, A. G. Sorenson and wife, Fred Kent and wife, Leon D. Van Winkle and wife, Lyman Utt and wife, and Reverend Claude L. Neal and wife,

[1]Reported in 208 P. (2d) 616.

in the superior court for Snohomish county, on or about April 24, 1945.

The purpose of the action was to obtain a judgment decreeing to be void a certain warranty deed purporting to have been made and executed by Mathea Severson on March 19, 1942, wherein Mathea Severson, as grantor, conveyed to the First Baptist Church of Everett lots 23, 24, 25, and 26, in block 667, Plat of Everett, subject to a certain lease made and executed January 19, 1928, by and between the grantor, as lessor, and M. J. Rumbaugh, as lessee; also adjudging that certain assignment of lease referred to in the deed to be void and of no effect; and further decreeing that the defendants have no right, title or interest in or to the property covered by such deed and assignment.

In the original complaint it is alleged in paragraph No. 5:

"That said deed and assignment of lease were obtained by the defendant Church through fraud; that the said deed and the said assignment of lease were not acknowledged before a Notary Public of the state of Washington as provided by the statutes of the state of Washington; that the plaintiff did not knowingly sign and execute said deed and said assignment of lease."

While defendants state in their brief that, as against the above allegations, defendants filed a motion and the court ordered a specification of the alleged fraud, we do not find in the record any such motion or order directed against paragraph No. 5 of the original complaint. However, plaintiff did file an amended complaint, and in paragraph No. 5 thereof it is alleged:

"That the plaintiff did sign said deed and assignment of lease but that at the time of signing same, she was not cognizant of the nature and identity of said instruments; that no consideration was given or rendered the plaintiff for said instruments; that said instruments were not acknowledged before a Notary Public, as provided by the statutes of the state of Washington, nor acknowledged by the plaintiff to a Notary Public that she had signed the same."

It is also alleged in paragraph No. 6 of the first amended complaint:

"That in the year 1942 and for several years thereafter, the defendant, Rev. Claude L. Neal, was the pastor of The First Baptist Church of Everett; that on the 21st day of March, 1942, and for some period of time prior thereto, he was the plaintiff's spiritual adviser and confidant and that he, as the pastor of said church, *did unduly influence the plaintiff to sign her name to said instruments.*" (Italics ours.)

A motion for bill of particulars was filed by defendants, directed against paragraph No. 6 of the first amended complaint, and thereafter the court entered an order requiring plaintiff to furnish to the defendants her verified bill of particulars setting forth the nature and substance of the acts or statements of defendant Claude L. Neal, as alleged in paragraph No. 6 of the first amended complaint. Thereafter, plaintiff, in compliance with such order, furnished the following verified bill of particulars:

"That the defendant, Rev. Claude L. Neal, individually, and as pastor of the defendant Church, did unduly influence plaintiff in the following manner:

" (1)  By transacting for her a considerable portion of her business without compensation therefor.

" (2)  By running numerous errands and purchasing for her various items such as groceries, meats, milk and household necessities, all without compensation.

" (3)  By taking into his possession and holding for her personal papers, instruments, deeds and contracts.

" (4)  By holding religious devotions with her and praying for her salvation and health."

To the first amended complaint the defendants filed an answer and cross-complaint, in which they admit that plaintiff at all times mentioned in the complaint was and is a widow, and that prior to March 19, 1942, was the owner in fee of the real estate described in the deed referred to in the complaint. Defendants admit that on or about March 21, 1942, there was placed of record and recorded in the office of the auditor of Snohomish county a warranty deed, duly executed and acknowledged by plaintiff on March 19, 1942, and thereupon delivered to the defendant First Baptist Church of Everett, which church has caused such deed to

be duly recorded; that also on March 21st, an assignment of the lease referred to in the complaint was duly recorded in the auditor's office, which assignment of lease had been executed and acknowledged by plaintiff on March 19, 1942, and thereupon delivered to the defendant church. Defendants deny that plaintiff was not cognizant of the nature and identity of such instruments at the time she acknowledged the same; deny that the instruments were not acknowledged by the plaintiff before a notary public; deny that plaintiff did not deliver the deed and assignment of lease; and allege affirmatively that plaintiff caused the deed and assignment of lease to be duly prepared and thereafter signed and acknowledged each of the same before a notary public and thereupon delivered the same to the defendant First Baptist Church of Everett. Defendants admit that in the year 1942, and for several years thereafter, defendant Claude L. Neal was the pastor of the First Baptist Church of Everett; admit that on March 21, 1942, and for some period prior thereto plaintiff consulted with Claude L. Neal as friend and spiritual adviser; and deny the allegation that Claude L. Neal unduly influenced plaintiff to sign her name to such instruments.

As an affirmative defense, defendants allege in substance that on or about March 19, 1942, and for a long time prior thereto, plaintiff was the owner of the property hereinbefore described, subject only to a lease which plaintiff had made in favor of M. J. Rumbaugh; that on March 19, 1942, and for a long time prior thereto, plaintiff had been a member of the First Baptist Church of Everett, was deeply interested in the work of that church, and was one of the many givers and supporters of the work of that church; that she had been a generous contributor and supporter of the financial responsibility of the church; that on or about March 19, 1942, acting in pursuance of her interest in and her desire to share in the work of the church and its financial support, caused to be prepared and thereafter to be executed and acknowledged before a notary public the deed and assignment hereinbefore referred to; that such instruments

were duly acknowledged by the plaintiff on or about March 19, 1942, and thereafter she caused the same to be delivered to the defendant church, which defendant caused such deed and assignment of lease to be duly recorded in the office of the auditor of Snohomish county; that it was the intention of plaintiff by so doing to vest in the defendant church the fee title to the real estate, and that the fee title did thereupon vest in the defendant church; that plaintiff permitted, consented to, and acquiesced in, that defendant's ownership until and including September 9, 1944, at which time she made a demand upon defendant church to divest itself of any interest in such real estate.

Defendants pray that plaintiff take nothing by this action, and that the title of defendant First Baptist Church in and to such real estate be ratified and confirmed.

The matter came on for hearing before the court on August 23, 1948, at which time plaintiff appeared personally and by her attorney, Lloyd Holtz, and all of the defendants, with the exception of Fred Kent and wife and Leon D. Van Winkle and wife, appeared by their attorneys, Henry Elliott and Leslie A. Lechner. Neither Van Winkle and wife nor Kent and wife were served with the summons and complaint in the action, and they did not appear. The court, having heard the evidence offered on behalf of plaintiff and defendants and the argument of counsel, on September 18, 1948, made and entered its judgment, wherein it ordered, adjudged and decreed:

"First, that the above entitled action be and hereby is dismissed.

"Second, that the defendant, First Baptist Church of Everett, Washington, be and hereby is decreed to be the owner of the fee title to the following described real estate, to-wit:

"Lots Twenty-three (23), Twenty-four (24), Twenty-five (25), and Twenty-six (26), Block Six hundred sixty-seven (667), Plat of Everett, situate in Snohomish County, Washington, with all right, title and interest in and to all rents, earnings or income of such real estate after the death of Mathea Severson, the plaintiff herein; subject, however, to the right of Mathea Severson, plaintiff, to

receive, hold, use and enjoy as her own, all rentals, earnings or income of said real estate as long as she shall live.

"Third, that the defendants appearing herein have judgment for their costs against the plaintiff, Mathea Severson, to be taxed by the clerk of this court."

Plaintiff timely filed a motion for new trial, which was denied by order of the court on October 8, 1948, and thereafter plaintiff gave notice of appeal to this court from the judgment made and entered on September 18, 1948.

Appellant makes the following assignments of error: (1) in failing to impose upon respondents the burden of proof to explain a transaction in which Reverend Neal acted in a highly fiduciary capacity; (2) in giving too much weight to the testimony of the fiduciary, who had admittedly breached his trust in some respects at least, and in failing to give sufficient weight to the testimony of appellant; (3) in reforming the deed, which was obviously unfair, instead of setting it aside; (4) in finding from the evidence that the deed and assignment of lease should not be set aside; (5) in failing to grant appellant a new trial.

Before discussing the testimony in this case, it should be stated that Judge Bell had known Mrs. Severson for many years. For the purpose of showing the trial court's opinion of her, we quote from a portion of the judge's memorandum opinion:

"Mrs. Severson is a truly remarkable woman. I am free to say that I have known of her for many years. I think it has mention in this case that she at one time performed services in my office, years ago, and she has for years stood out in my mind and does still stand out as about the finest example I have ever seen in my life of what one may accomplish by sacrifice, by industry, by thrift."

The statement of facts in this case contains approximately three hundred seventy-five pages of testimony. The direct, cross, redirect, and recross examination of appellant consumes about two hundred ten pages. The great length of appellant's testimony was largely due to the fact that she did not answer directly the questions propounded to her by her own counsel on direct examination, or by opposing coun-

sel on cross-examination, but would sometimes consume almost a page in a recitation of some facts not in answer to the question propounded, and in many instances having no connection therewith, before she would in some manner answer the question. The trial court and counsel for respondent, as well as appellant's own counsel, were very patient with her in their attempts to get her to answer the questions propounded. Very few objections were made during the time appellant was on the stand. In commenting on appellant's testimony, the trial court stated:

"Of course, I realize that Mrs. Severson, by reason largely of the fact that she will not directly and concisely and concretely answer proper questions, in some large measure, destroys the effectiveness of her testimony,—deprives it of that probative value and force which comes from direct and clear answers to simple questions."

Mathea Severson was born in Norway, May 31, 1866, and came to the United States in September of 1893. When asked relative to her education and what schools she went to in Norway, she answered: "Just plain school. The school in Norway is better than you go to high school here." When asked what she was trained for in school, she stated:

"A. In school I had my catechism, and Bible stories, and then I was confirmed, you know. I'm a Lutheran, you know. Q. Just go slow, now, Mrs. Severson. Did you take up any kind of bookkeeping? A. No, not one thing. I have bookkeeping in my head. Q. Did you take any mathematics or arithmetic in school in Norway? A. Oh, yes. I remember most of the things I learned in business, and everything in the school there. I go to school in Norway, you know. Q. After you came to the United States did you take any schooling here? A. No, I should say not. I learn English, you know. I had a book with English on one side and Norwegian on the other side."

She first lived in Evanston, Illinois, and worked as a domestic during the time she was there. According to her testimony, Mrs. Severson came to Everett on October 20, 1900, at which time she was thirty-three years of age. She had married shortly prior to the time she came to Everett. Almost immediately after arriving in Everett, she began to do

janitor work in the offices at Everett, and took care of the undertaking parlors of a Mr. Jerread for many years. She also took care of other offices and worked in and around the Bank of Commerce for Mr. Olson and others. It appears from Mrs. Severson's testimony that she received from the business men for whom she worked a good many tips as to opportunities for investing her money. Apparently acting upon one of these tips, she purchased the downtown lots here in question, and negotiated a ninety-nine year lease, with an annual rental of two thousand dollars, for the property upon which the Rumbaugh building was erected by the lessee. She never had a bank account, but would keep in and about her house or room the money she earned, and as it accumulated, make the investments which were recommended to her, or would purchase bonds or contracts, her principal desire being to invest her money in something which would pay her interest.

In 1934, she fell and received an injury to her hip, and since that time she has been very largely confined to her room. She at one time owned a home in Everett in which she lived, but for many years she has occupied a room in the Clark building in Everett. This room is not modern, and is on the third floor of the building.

While Mrs. Severson apparently was raised a Lutheran, and still states that she is a Lutheran, she was baptized many years ago and became a member of the First Baptist Church of Everett, and since that time she has been much interested in the welfare of this church. She gave to the church twelve thousand dollars to purchase a pipe organ and has since that time paid for the cleaning of the pipes and other things necessary to be done to keep the organ in repair. Since she was injured she has not attended church to any great extent, but, in spite of statements made in her testimony, there is no question but that she was and still is interested in this church. She has made loans to the church through the years. She made a will in which she left practically all of her property to this church.

Prior to the coming of Reverend Neal to Everett, Mrs. Severson had made available to the church, as a parsonage,

a residence belonging to her, and on October 30, 1937, she entered into an agreement with the church (defendants' Ex. 4), wherein, in consideration of Mrs. Severson having conveyed to the church lots 17 and 18, block 376, Plat of Everett, division "G", the church agreed to pay Mrs. Severson the sum of twenty-five dollars per month, on the 5th day of each and every month, beginning November 5, 1937, until her death. Subsequently, Mrs. Severson made loans to the church, for which promissory notes were given by the church to her, and on November 13, 1939, Mrs. Severson and the church entered into what is termed a supplemental agreement (defendants' Ex. 5), wherein the church agreed to pay Mrs. Severson the sum of $40.83 each month during her lifetime, beginning on December 1, 1939. This agreement in effect superseded the former contract, as the payment of $40.83 included the twenty-five dollar monthly payment provided for in the agreement of October 30, 1937.

On July 31, 1941, Mrs. Severson and the church entered into an agreement (defendants' Ex. 6), which canceled the previous agreements. We quote from the agreement:

"First Party and Second Party having heretofore entered into several agreements whereby Second Party obligated itself to pay certain monthly sums to First Party in consideration of money advanced by First Party to Second Party and of other valuable considerations and both parties hereto wishing to combine all of said agreements into one agreement, now therefore  . . ."

The agreement then recites:

"It Is Hereby Agreed that Second Party will pay to First Party monthly during the remainder of lifetime of First Party, the sum of Seventy-five and no/100 Dollars ($75.00), the first such payment to be made on or before the 10th day of September, 1941, and a like payment to be made on or before the 10th day of each and every month thereafter during the lifetime of First Party. On the death of First Party this agreement to be null and void and all obligation on the part of Second Party to cease. This agreement cancels all previous agreements between parties hereto."

The church has paid to Mrs. Severson the sum of seventy-five dollars per month, as provided in the contract.

As stated by Judge Bell, Mrs. Severson was a very remarkable woman in many ways. However, her chief interest seemed to be in accumulating money. While she stated in her testimony that she never gave anything, the fact is that she did make gifts in many instances.

Reverend Neal came to Everett as pastor of the First Baptist Church in 1934. Shortly after coming to Everett, he visited Mrs. Severson, with a Mr. and Mrs. Palmer. Mrs. Severson was at that time living in her Maple Heights home, and was referred to as one of the "shut-ins" of the church. There is no question but that Reverend Neal performed many services for appellant up to the time their relations became strained and Mrs. Severson refused to have anything further to do with him. He would go on errands for her, he collected rent for her from some of her property, he purchased bonds for her, and did many other things which he stated were at her request.

We come now to the instruments which are particularly involved in this lawsuit, namely, the warranty deed of March 19, 1942, from Mathea Severson to the First Baptist Church of Everett, to what is known as the Rumbaugh property, and the assignment of the ninety-nine year lease to this property held by Mr. Rumbaugh. When Reverend Neal was on the witness stand he was handed the warranty deed above referred to (plaintiff's Ex. A), and asked if he had anything to do with the preparation of that instrument.

"Q. Tell us, Mr. Neal, what you had to do with the preparation of them, and at whose request, and so on. A. I don't recall the date, but I remember receiving a call one morning from Mrs. Severson. Well, she didn't call me, she had someone else call, for me to come up. She wanted to see me. I told the party to tell her that I would be there some time before noon . . . When I got up there she was alone. She says, 'I have been thinking about the Rumbaugh property.' She says, 'You know I want the church to have everything I have.' And she says, 'There is a possibility of a will being broken. I want to make a deed to this property to the church. I want the church to have it now. All I want is the rental on the building as long as I live.' Then she said, 'When I die, you will have a deed to the property; there will be no will to be broken, there will be no lawyers to pay.

This makes it easy for you.' Now, these are her words as nearly as I can remember them. Then I said, 'Who shall I have do this? I am very busy today. I have got a funeral right now.' 'Well,' she says, 'I want it done today.' And I said, 'Well, I don't know whether I can have it done today or not.' She asked to take it over to Mr. Lechner. I said, 'I will go over and see, he may not be in his office. But, Mrs. Severson, I have to be at the funeral home at eleven o'clock.'

"I went to his office, and Mr. Lechner,—I just got there in time to catch him. He said, 'I have an important engagement.' I told him what Mrs. Severson said, she wanted this fixed today, and he said, 'All right. When will you be back?' I said, 'The funeral usually takes about an hour.' I returned later, and he wasn't quite through with it. I waited a few minutes for him, and then I took the papers over to Mrs. Severson's apartment, and I said, 'Here are your papers.' She wanted me to read them over to her, and I read them over to her. 'Now,' I said, 'You can think these over, and I will see you later.' It was noon, then. 'No,' she said, 'I want you to go down right now and get Mr. Anderson. I want to sign these up. I want to get rid of them.'

"I went down and Mr. Anderson wasn't in his place of business. He had gone to lunch. I came back and told her that. She said, 'You go over and see Mr. Sorenson and get him.' I went over and Mr. Sorenson happened to be there. I told him what I wanted. He slipped the seal in his pocket and we came across and went up to the apartment and she signed those documents.  Q. The deed and the assignment of lease? A. That's right, and folded them up, and handed them to me and she says, 'Now, you take this and put them on the record.' I came right down the steps with Mr. Sorenson, and he stopped in Arthur Anderson's office, gave them to the girl there and said, 'Send the bill to the First Baptist Church.' And I think that is the last time I ever saw those papers until now,—until since I came back here. They were mailed to the trustees of the church. They are the custodians of the church property."

Reverend Neal testified that in all the business affairs with Mrs. Severson relating to money, purchase of bonds, transfer of property, the initiative was taken by Mrs. Severson, and it was at her solicitation that he performed the services in regard to those matters.

Arthur Sorenson, who purportedly took Mrs. Severson's acknowledgment to the warranty deed and assignment of

lease here in question, was a real-estate broker and insurance man, and had lived in Everett for many years. He had been a trustee of the First Baptist Church, but was not at the time the acknowledgments to these instruments were taken. According to his testimony, he had known Mrs. Severson for about twenty-two years, and had negotiated several loans for her, sold her several contracts, had done considerable notary work for her, and had run some errands for her. While Mr. Sorenson stated that Mrs. Severson was an exceptionally intelligent person, he further stated that she used poor judgment sometimes in her procedure in making loans. Mr. Sorenson was then handed the warranty deed here in question, and asked when he first saw it.

"A. I first seen that about twelve-thirty on the 19th day of March, 1942. Q. Do you know whose signature that is on the instrument, Mr. Sorenson? A. That is the signature of Mathea Severson. Q. Had you seen that same signature many times before? A. Many times. Q. Had you taken the acknowledgment of that signature before? A. Scores of times. Q. Did you see her sign that that day? A. I did. Q. At whose request had you gone over there? A. At the request of Dr. Neal. Q. For what purpose did he ask you to go over? A. Dr. Neal came in the office and announced that Mrs. Severson had decided to deed the Rumbaugh property to the church, and he asked me if I would accompany him and take her acknowledgment of her signature. Q. Did you take her acknowledgment after she signed it then? A. I did, there. Q. There in his presence? A. In the presence of Dr. Neal and Mrs. Severson. Q. That was in her apartment, or living quarters, in the Clark Building? A. That is right. Q. What was done with the instrument after it had been executed and acknowledged? A. Mrs. Severson handed it to Dr. Neal. I don't remember the conversation. There were some words spoken; but as I only went there in the capacity of a notary I don't remember just what words were spoken. Q. Did you leave alone, or did you leave in company with anyone? A. I believe Dr. Neal accompanied me down the stairs into the street.

"Q. Handing you plaintiff's exhibit 'B' [assignment of lease], I will ask you to tell us what you know about that, if anything. A. This assignment of lease covering the leasehold on the Rumbaugh property, was executed by Mathea Severson in my presence at the same time that the

deed that I previously spoke of. Q. Did you take her acknowledgment on that instrument, also? A. I did. Q. This is your signature on both of these instruments as notary? A. Yes. Q. And that seal is the seal of yourself as attached? A. The seal is mine. Q. The circumstances were the same with reference to the assignment as to the deed that you testified to, were they? A. The same, yes, sir."

While Mrs. Severson's testimony seems at times to be somewhat derogatory of Mr. Sorenson, we are satisfied that she did in fact have confidence in him. In about 1938 there was some property available in Everett at the corner of Thirty-second and Colby avenue. Mr. Sorenson had been appointed by the board of trustees of the First Baptist Church to head a committee to look for a new site for the church. According to Mr. Sorenson, Mrs. Severson was interested in this matter, and had discussed with him at various times the matter of obtaining such a site, and she had obtained architects' sketches of churches and discussed them with Mr. Sorenson, and had compared such sketches with churches in Norway.

About this time Mr. Sorenson was contacted by a Mr. Rymond and apparently informed that the above-mentioned property was for sale, and it appealed to Mr. Sorenson as a logical site for a new Baptist church. This property consisted of four lots, and was priced at $5,500. There were some improvements on the property. Mr. Sorenson made a small deposit on the property to hold it, as he stated, figuring that if the church did not want it, he would buy it himself. He then took the matter up with the board of trustees, who voted unanimously to purchase the property, he assuring the board that Mrs. Severson would assist. The matter was next taken up by the elective officials of the church, who voted to purchase the property. It was then taken up with the membership of the church, who failed to authorize the purchase of the property. Mr. Sorenson reported this matter to Mrs. Severson. Upon receiving such report, Mrs. Severson stated: "You and I will do what that whole church is unable to do." Mr. Sorenson's testimony continues:

"And then she went on to tell me that she would like me to contact two others,—that was Fred Kent and Rosie Erickson, to act as her trustees in handling this property. She also asked me to have T. E. Skaggs, who was then postmaster, draw up a trust agreement, and that I did. I had Mr. Skaggs do that. I have Mr. Skaggs' handwriting in my pocket now of that trust agreement. I typed the agreement. We secured a notary, Fred Buell, I believe, and everyone concerned executed this trust agreement.

"Mrs. Severson put up the money, I believe, in several installments. But within the course of a few weeks she had paid the full fifty-five hundred. That agreement was placed in escrow with the Washington Title Insurance Company here in Everett, and it called for the property to be put in the name of these three trustees which Mrs. Severson had named; and the three trustees named me as a trustee to act for the group, and they in turn deeded the property to me. And it was provided in the agreement that I would execute a warranty deed and leave it with the title company, in escrow, to be delivered to the First Baptist Church, to whom the deed went, when Mrs. Severson passed away. And a death certificate was considered sufficient evidence to make delivery. That was done. And the deed to that property is now escrowed with the Washington Title Insurance Company . . .

"Q. Have you handled that as trustee for Mrs. Severson up to this time? A. Yes, I have. Q. In handling that, you have, I suppose, had to do with insurance, and rentals, collection of rentals, and so on? A. Yes. Q. Have accountings been made to her from time to time? A. Every year there has been an accounting of all expenditures and the amount on hand in the fund. A copy of that has been sent to each of the trustees and to Mrs. Severson. Q. Do those papers still remain in escrow under which it becomes the title of the Everett Baptist Church on her death? A. Yes. Q. That agreement is still in effect, except as modified by the supplemental agreement you referred to? A. Yes. Q. Did Dr. Neal, Claud Neal, ever procure Mrs. Severson's consent to that—what did Dr. Neal have to do with getting Mrs. Severson's consent to that arrangement? A. He had nothing whatever to do with that. Q. To your knowledge, did he have anything at all to do with it? A. No, I don't believe he even had any knowledge of it until I told him years later. I don't think he knew a thing about it. Q. So far as you know, did Mrs. Severson ever consult with Dr. Neal about it? A. I'm certain she did not, because Dr. Neal

was surprised when I told him about the arrangement. Q. Now, did Mrs. Severson ever indicate to you that it was her expectation to make it possible for the church to build a building on those lots? A. That was very much in her mind at the time. Q. She so expressed it? A. As I stated, she had these architects' pictures of nice churches, and had some very definite ideas as to location of parsonage, and recreation areas, and arrangement of Sunday School; and she had plans for years before this came up on this matter . . .

"Q. Has it been your impression from your dealings with her that she has been, or has not been, very much interested in the Everett Baptist Church and its future, particularly in the way of buildings, and that sort of thing? A. I would say that was a large part of her life at that time—planning. She would always bring up the church every time I would call. Q. Are the original trustees that she named still the trustees, or has there been any change? A. On this Colby lot deal? Q. Yes. A. Yes, sir, the original trustees are still serving. Q. That is Mr. Kent, Mr. Erickson and yourself, is that correct? A. That's right. Q. Has Mrs. Severson at any time, Mr. Sorenson, come to you, or sent word to you, or in any way communicated to you, that she did not know on March 19th, 1942, when you were over there in her room with Dr. Neal, that she was signing a warranty deed and assignment of lease on the land that the Rumbaugh Building stands on? A. No, she never expressed herself that way. Q. Has she ever to you personally at any time indicated that she was taken advantage of and did not know what she was doing? A. No."

In order to illustrate what we have heretofore said in regard to the testimony of Mrs. Severson, we quote from her direct testimony relative to the deed and assignment of lease here involved:

"Q. Mrs, Severson, did you on the 19th day of March, 1942 — A. (Interposing) I never give them nothing. Q. (Continuing) — execute this deed which is marked Plaintiff's Exhibit 'A'? A. I have all my papers myself. Why would I make other papers for them, because I have them myself. I could take those papers and give them to them, then. I wouldn't put it on record then, would I? Q. Just a minute. On the 19th day of March, 1942, did you execute this deed to the First Baptist Church? A. Not by my knowledge, no, sir. You can ask me a thousand questions and the answer is all the same. I never gave them the Rumbaugh

Building, or anything else, because it don't belong to me. Q. Well, the land, —did you give away the land that day? A. The land? Q. Yes. A. That land is on a lease for ninety-nine years. Q. Plaintiff's Exhibit 'B', which is an assignment of lease from you to the First Baptist Church — A. (Interposing) I'll tell you the straight truth. There is nothing true about that whole darned thing there. Q. (Continuing) — on the 19th day of March, 1942, did you sign this? A. If I signed it, I didn't know it, by my knowledge. Q. Did you execute any assignment of lease of the Rumbaugh property, the Rumbaugh building, to the First Baptist Church on that date? A. I never gave the First Baptist Church, and never expect to, give them anything because I never liked them, and I don't intend to go in there. I never would go in there unless they give me big money for it. Fights all the time in that place. Q. On the 19th day of March, 1942, to your knowledge was A. G. Sorenson, notary public, in your apartment or flat? A. Sorenson? Q. Yes. A. (No response) Q. I asked you a question, Mrs. Severson. Was Mr. Sorenson in your apartment on that day? A. Never been up to see me, and I never called on him. Q. Did you sign any deed on that day in his presence? A. I told you I don't know anything about it. Q. I asked you again, did you sign any deed on the 19th day of March? A. I never call on him, and he never come and do anything for me. I never had anything to do with him. Q. Mrs. Severson, on the 19th day of March, 1942, did you sign, in the presence of Mr. Sorenson, any deed? A. I don't know how they can say all those things in there because it's all lies. Q. I have got to ask you again, Mrs. Severson. On the 19th day of March, 1942, did you sign any deed — A. (Interposing) If I signed it there, I don't know it. Q. (Continuing) I say, did you sign any deed in the presence of — A. (Interposing) No, I don't go by any papers like that. I wasn't born today, and I want you to know I wasn't going to give them anything. I've been through with them ever since I told Vinje about it.

"The Court: Ask her if she saw Mr. Sorenson on the 19th day of March, 1942. Q. Did you see Mr. Sorenson on March 19th, 1942? A. No, I don't know anything about it. I saw Mrs. Sorenson, but I never had any use for Mr. Sorenson anyhow, because he has been nothing but a dead-beat all his life. I never had no use for him. Q. Wait a minute! Did you see Mr. Sorenson on that day? A. I couldn't tell that because I see lots of people, and I don't go around counting their names. Q. Did he come to your apartment on that

day at all, Mrs. Severson?   A. I don't know nothing at all about it, because nobody go in that apartment I have, because it ain't fit for anybody. You can't even sit down.   Q. Were you in his office on that day?   A. I never been in his office.   Q. You have never been in his office?   A. I should say not. Ha! Ha! Ha!   Q. Do you know where his office is? A. I think they are moved. I don't know.   Q. Where is his office now?   A. Johnson he went from the bank and worked for him—Art Johnson—I think it's on Wetmore somewhere. I have never been there because I can't walk. How can I go any place, I'd like to know. I can't walk. I have to have help going even forth and back."

Mrs. Severson, during her direct examination, was interrogated concerning a good many other transactions had with Reverend Neal and with other parties, and her counsel had the same difficulty in obtaining any direct answers to his questions as it will be noticed he had in the foregoing testimony.

Mrs. Severson seemed to have an unusual memory for some dates and for the details of transactions which were favorable to her, but when interrogated relative to matters which might be detrimental, in so far as any claims of the First Baptist Church were concerned, it was impossible to really get any direct answers.

We call attention again to the fact that, while her testimony above quoted was quite derogatory of Mr. Sorenson, yet he was named by her as trustee of the property which, under the trust, would eventually go to the church, and Mr. Sorenson is still acting in that capacity, or at least was up to the time of the trial, and was reporting to Mrs. Severson regarding any income from the property.

There was considerable said in appellant's brief relative to some bonds which were purchased by Reverend Neal for Mrs. Severson, and concerning the difficulty she had in getting such bonds returned to her. However, there is no contention but that she did receive all the bonds which were ever purchased by Reverend Neal, and so far as this record shows, Reverend Neal never profited, personally, by any of the transactions, except that she did assist him in the pur-

chase of an automobile when he first came to Everett, and this was done at her own suggestion and initiative.

Mrs. Severson, in her testimony, referred to the fact that she could not get back the bonds which had been turned over to Reverend Neal for safekeeping, and stated that it was only because of the assistance given to her by Mrs. Lottie Skaggs, and Mrs. Skaggs' influence with Reverend Neal, that the bonds were returned. However, Mrs. Skaggs, who was called as a witness, testified concerning this matter as follows:

"Q. Did you have anything to do with any transfers that she [Mrs. Severson] made to the church, or the church to her? A. No, never. Q. Did you at any time participate in any persuasion or any advice, or suggestion, or coercion of Dr. Neal, Dr. Claude L. Neal, to return to Mrs. Severson any papers which she claimed he had of hers? A. No, I had no authority, or no reason, to do that. Q. And you did have no part in it at all? A. No. Q. There never was any such thing as you making him, or forcing him to return any papers? A. No, we have always been the best of friends. Q. I understand it, you know nothing, and did know nothing of the transaction at all? A. No, only as you hear, you know. But I never had anything to do with it personally, not being on the Board or anything. I never had any business transactions."

We again quote from the memorandum opinion of the trial court made at the close of the case:

"In the light of what is here by way of evidentiary fact, giving to it all as best I can that weight which I conscientiously believe it should receive, I am unable to say that it fairly preponderates, lends greater reason to believe, that Reverend Neal worked the deprivation of Mrs. Severson of her power to exercise her own free will, to make her own election, to do as she saw fit to do at the time of the execution of instruments 'A' and 'B'.

"I find no direct testimony, even from Mrs. Severson, that he, by any actual spoken or written word, sought to induce her to do as she did, or even that he unreasonably, if at all, attempted to persuade her to do as she did.

"Now, of course, undue influence means that influence which is undue. Mere persuasion in proper manner under proper circumstances, mere inducements offered or reasons

given why a course of action should be pursued is not undue influence."

Continuing from the memorandum opinion:

"Now, of course, here I reach this difficulty in weighing her testimony, because I think she even went so far as to say that she never did acknowledge these instruments before any notary public. At least, I so understood her words. But she did. The probative force of testimony that bears upon it is entirely too strong than to decide otherwise.

"Mr. Sorenson certainly—although a member of the church and a one-time trustee of the church—and the Reverend Neal, with his position in the church, are not to be held to have committed the most apparent perjury when they say and tell me under oath that she did sign this instrument in the presence of Mr. Sorenson, at least, and that she did acknowledge it before him as he had certified under his seal of a public official. She knew what she was doing."

There is considerable said in appellant's brief relative to the fact that the deed did not reserve to Mrs. Severson the income from the Rumbaugh property during her lifetime, and that that is an indication that Reverend Neal intended to take advantage of her, and is an evidence of the undue influence which was exerted by him in obtaining Mrs. Severson's signature to the deed and assignment of lease in question. It is true that the deed contains no reservation of interest in Mrs. Severson. However, it will be remembered that Reverend Neal went to the attorney suggested by Mrs. Severson to have the deed drawn, and it is further admitted that the parties have placed their own interpretation upon the transaction, and that since the execution of the deed, namely, March 19, 1942, Mrs. Severson has enjoyed reservation of all the income produced under the lease, and is still obtaining such income, and no claim to the income from the lease is made by the church, respondents admitting that Mrs. Severson is entitled to the enjoyment thereof during her lifetime.

It is contended by respondent church that Mrs. Severson, at the time of the execution of the deed and assignment, intended to and did make a completed gift *inter vivos* to the respondent. As hereinbefore stated, it is now the general

contention of appellant that the deed and assignment were procured by undue influence exercised by Reverend Neal, and that the deed and assignment should be set aside and held to be null and void.

After an examination of all the testimony and the exhibits introduced in this case, we are unable to say that the trial court erred in concluding that Mrs. Severson, of her own will, executed the deed and the assignment of the lease, and delivered them to Reverend Neal on behalf of the church, for the purpose of vesting the church immediately with the fee title to the property, subject only to her right to collect rentals and income therefrom during her lifetime.

We stated in *Maxwell v. Harper,* 51 Wash. 351, 356, 98 Pac. 756:

"A grantor's deposit of his deed with a third party, to be held by such third party until the grantor's death and then delivered to the grantee therein named, the grantor reserving no dominion or control over the deed during his lifetime, constitutes a valid delivery and vests an immediate estate in the grantee, subject to a life estate in the grantor. [Citing cases.]"

There is no question but that, under the case cited and the following cases, we have held that a valid gift of the fee of real estate may be made *inter vivos,* the donor retaining the use, management and control of the property during his lifetime. *In re Kirkpatrick's Estate,* 140 Wash. 452, 249 Pac. 980; *Rennie v. Washington Trust Co.,* 140 Wash. 472, 249 Pac. 992; *In re Cunningham's Estate,* 19 Wn. (2d) 589, 143 P. (2d) 852.

As to the question of undue influence, we are in accord with appellant's contention that Reverend Neal occupied a confidential relationship toward Mrs. Severson. Nor can it be denied that he was in a position to exercise influence over Mrs. Severson. However, that is not sufficient, in our opinion, to establish that the execution of this deed and the assignment of the lease was procured through undue influence exercised by Reverend Neal. We have been unable to find in the record any direct testimony, even by Mrs. Severson herself, that she was in any way influenced by

Reverend Neal to execute the deed and assignment of lease here in question.

Appellant states in her brief: "The rule applicable to wills should apply to deeds with equal effect." We have many times stated that we are committed to the rule that, to vitiate a will, there must be more than influence. It must be undue influence at the time of the testamentary act, which interferes with the free will of the testator and prevents the exercise of judgment and choice. *In re Larsen's Estate,* 191 Wash. 257, 262, 71 P. (2d) 47. In *In re Bottger's Estate,* 14 Wn. (2d) 676, 699, 129 P. (2d) 518, we again stated:

"It is the universal rule that a will procured by undue influence is invalid, but the courts have always recognized that a will cannot be overthrown upon this ground unless the influence complained of was, in fact, *undue* influence. Our decisions clearly hold that influence may be exerted upon a testator in the form of advice, persuasion, or even importunity, directed to the end of affecting the testamentary disposition of his property, without in any way invalidating the will induced by these means. [Citing cases.] This was recognized in *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47, where we said:

" 'To vitiate a will there must be more than influence. It must be undue influence. It was not undue influence for the son to persuade or solicit his mother to award him the greater part of the estate rather than to award it to the daughter. Influence becomes undue only when it overcomes the will of the testator or the testatrix, when the act of making the will is the result of such coercion that free agency is destroyed. The disposition of the property may be changed by the influence exercised, but so long as the mind of the testator or testatrix is not overborne by the mind of another, it does not amount to undue influence.' "

After referring to other cases, we again stated in the cited case:

"The essence of all these various formulae is that in order to constitute ground for invalidating a will, the influence allegedly exerted over the testator must have been such as to override his will power and substitute the will of the person exercising the influence. In other words, the person accused of dominating the testator must have imposed his wishes upon the latter, not by persuasion directed to his

intellect or by appeal to sentiment, but by coercion of his mind by threats, force, or unbearable insistence, so that the testament, though in form that of the testator, is in fact that of another who has established ascendancy over the mind of the former."

43 C. J. S. 379-380, in attempting to formulate a definition of undue influence, states:

"All that can be said, in the way of formulating a general rule on this subject, is that whatever destroys free agency and constrains the person whose act is brought in judgment to do what is against his will and what he would not have done if left to himself is 'undue influence,' no. matter by what means the control is exercised, whether by physical force, duress, fraud, threats, importunity, or any other species of mental, moral, or physical coercion. The means employed, the extent or degree of the influence, and by whom it is exerted, are all immaterial, for the question to be determined is always: 'Was the influence, whether slight or powerful, sufficient to destroy free agency, so that the act put in judgment was the result of the domination of the mind of another rather than the expression of the will and mind of the actor?' "

We conclude, therefore, as did the trial court, that in executing this deed and assignment of lease to the respondent church, it was the intention of Mrs. Severson to immediately vest the church with the fee simple title to this property, subject only to her right to collect rentals and income therefrom during her lifetime, and that no undue influence was exercised by Reverend Neal over Mrs. Severson in procuring the execution of such documents.

We have examined the authorities cited by appellant in support of her contentions, and have no quarrel with the decisions in the cases cited, but in our opinion they are not applicable here.

We have quoted at some length from the testimony in this case, and have extended this opinion perhaps to an unreasonable length, but it will be understood that this property admittedly is of the value of approximately fifty thousand dollars, and that Mrs. Severson, as has been stated, was an elderly woman at the time she executed these in-

struments, and in view of all the facts and circumstances, we were of the opinion that a considerably detailed statement of the facts was warranted.

For the reasons herein mentioned, the judgment of the trial court must be, and it is, affirmed.

BEALS, MALLERY, STEINERT, and SCHWELLENBACH, JJ., concur.

September 12, 1949. Petition for rehearing denied.